**CIM INSURANCE CORPORATION,**
Plaintiff,

v.

**Tony MASAMITSU; Tony Management Group; Pacific Nissan, Inc.; and Pacific MH, Inc., Defendants.**

**Pacific Nissan, Inc.; Pacific MH, Inc.; Tony Management Group; and Tony Masamitsu, Plaintiffs,**

v.

**Motors Insurance Corporation; CIM Insurance Corporation; MIC Property and Casualty Insurance Corporation; and DOE Entities 1–50, Defendants.**

Nos. Civ. 97–01533SPK,
Civ. 98–00114SPK.

United States District Court,
D. Hawaii.

Dec. 6, 1999.

Wesley H. Sakai, Jr, Scott I. Batterman, Bendet Fidell Sakai & Lee, Honolulu, HI, for plaintiff.

Peter W. Olson, Cades, Schutte, Fleming & Wright, Honolulu, HI, for defendants.

1. Defendants (in Civ. No. 98–00114) Motors Insurance Corporation and MIC Property and Casualty Insurance Corporation are affiliated with CIM. While recognizing a possible issue regarding which corporate entity is the technically proper defendant, this order refers primarily to "CIM" as the insurer.

## ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT

SAMUEL P. KING, Senior District Judge.

These consolidated cases raise several insurance coverage and bad faith issues arising from an underlying dispute between Tony Masamitsu; Tony Management Group; Pacific Nissan, Inc.; and Pacific MH, Inc., ("the Tony Group"), on the one hand, and Franklin Kudo, Ross Sugibayashi, Sophie Isobe, and Eve Okumura ("the Kudo Group"), on the other. The CIM Insurance Corporation[1] insured the Tony Management Group, Inc., with a commercial package policy consisting of property loss, commercial crime, garage operations, general liability, and inland marine coverages.

The underlying dispute was arbitrated, resulting in an award of over $2 million to members of the Kudo Group. The award included a portion of the Kudo Group's attorneys' fees. Additionally, the Tony Group incurred attorneys' fees of over $3 million. The underlying dispute thus cost the Tony Group approximately $5 million.

The instant suits followed because of insurance coverage disputes between the Tony Group and its carrier, CIM. In Civ. No. 97–01533SPK, CIM seeks declaratory relief that it satisfied its duties under the applicable coverages. In Civ. No. 98–00114SPK, the Tony Group counters, seeking declaratory relief as well as damages for bad faith and breach of contract. Jurisdiction is based upon diversity of citizenship.

Cross-motions for summary judgment or partial summary judgment are before the Court. For the reasons to follow, the motions are GRANTED in part and DENIED in part.

## BACKGROUND

The Court begins by setting forth the relevant language of the insurance policy and endorsements. This sets the context for analyzing the facts and procedural history of the underlying dispute to determine whether (or when) coverage was triggered and whether the insurer fulfilled its corresponding duties under Hawaii law.

### A. Policy language—Garage Operations Coverage

CIM's coverage for "Garage Operations" named as insured the Tony Management Group, Inc., with a $1 million limit. The coverage provided as follows:

We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies caused by an "accident" and resulting from "garage operations."

We have the right and duty to defend any "suit" asking for these damages. However, we have no duty to defend "suits" for "bodily injury" or "property damage" not covered by this Coverage Form. We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends when the applicable Liability Coverage Limit of Insurance has been exhausted by payment of judgments or settlements.

Several clauses of this garage coverage are at issue, including the following as defined in the policy:

A. "Accident" includes continuous or repeated exposure to the same conditions resulting in "bodily injury" or "property damage."

. . . .

C. "bodily injury" means bodily injury, sickness or disease sustained by a person including death resulting from any of these.

D. "Garage operations" means the ownership, maintenance or use of locations for garage business and that portion of the roads or other accesses that adjoin these locations . . . . 'Garage oper-

ations' also inlcude [sic] all operations necessary or incidental to a garage business.

. . . .

I. "Property damage" means damage to or loss of use of tangible property.

J. "Suit" means a civil proceeding in which damages because of "bodily injury" of [sic, or] "property damages" to which this insurance applies are alleged. "Suit" includes an arbitration proceeding alleging such damages to which you must submit or submit with our consent.

The garage operations coverage contained a "Limit of Insurance" clause:

C. Limit of Insurance

Regardless of the number of covered "autos," "insureds," premiums paid, claims made or vehicles involved in the "accident," the most we will pay for all damages resulting from any one "accident" is the Limit of Insurance for Liability Coverage shown in the Declarations.

All "bodily injury" and "property damage" resulting from continuous or repeated exposure to substantially the same conditions will be considered as resulting from one "accident."

In turn, an endorsement to the garage operations coverage ("Broadened Coverage—Garages") broadened the protection to cover "personal injury" and "advertising injury" (with $1 million limits) as follows:

We will pay all sums the "insured" legally must pay as damages because of:

a. "Personal injury" caused by an offense committed:

(1) In the conduct of your business; and

(2) In the Coverage Territory during the Policy Period.

b. "Advertising injury" caused by an offense committed:

(1) In the course of advertising your goods, products or services; and

(2) In the Coverage Territory during the Policy Period.

We have the right and duty to defend any "suit" asking for these damages. However, we have no duty to defend "suits" for "personal injury" or "advertising injury" not covered by this Coverage Form. We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends when the Personal Injury and Advertising Injury Liability Coverage Limit of Insurance has been exhausted by payment of judgments or settlements.

The relevant additional definitions in this endorsement are as follows:

"Personal injury" means injury, other than "bodily injury," arising out of one or more of the following offenses:

. . . .

4. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

5. Oral or written publication of material that violates a person's right of privacy.

"Advertising injury" means injury arising out of one or more of the following offenses:

1. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

Similar to the garage coverage, the broadened coverage endorsement limited the insurance amount as follows:

C. Limit of Insurance

1. Regardless of the number of "insureds" or claims made, the most we will pay for all damages sustained by any one person or organization is the Limit of Insurance for Personal Inju-

ry and Advertising Injury Liability Coverage shown in the Schedule.

2. If the policy is issued for a period of more than one year, the Limit of Insurance will apply separately to each consecutive annual period.

In turn, the "personal injury" coverage was further broadened by another endorsement, an Amended Personal Injury Liability Coverage, which provided:

The definition of "Personal Injury" is expanded to include: Injury from mental anguish or injury; shock or humiliation. It also means injury arising out of:

6. Discrimination.

As used in this form, discrimination means the act of differentiation based on age, race, color, sex, religion, national origin, physical handicap or sexual preference which violates any applicable federal, state or local statute which pertains to discrimination.

"Personal Injury" arising from discrimination is limited to $250,000 for any one "occurrence", and a total of $1,000,000 for any one annual policy term. Defense costs paid for any one claim arising from discrimination will reduce the limits of insurance for this coverage.

Broadly stated, then, the applicable coverage[2] is for (1) "garage operations," (2) as broadened by a "personal injury" and "advertising injury" liability endorsement, (3) as modified by an "amended personal injury liability coverage" endorsement.

**B. Other provisions.**

Several other clauses are also at issue. Both the "Garage Coverage" and its "Broadened Coverage—Garage" endorsement (for personal and advertising injury) contained a "supplementary payments"

---

2. CIM also provided commercial general liability coverage, with similar coverages for "bodily," "property," "personal" and "advertising" injury caused by "occurrences." The CGL coverage form, however, specifically excluded such injuries arising out of "garage operations," presumably because such inju-

ries would be covered under the specific garage coverage form.

The CGL coverage form defined an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

coverage extension. The extension provides in pertinent part:

a. Supplementary Payments. In addition to the Limit of Insurance, we will pay for the "insured:"

. . . .

(5) All costs taxed against the "insured" in any "suit" we defend.

(6) All interest on the full amount of any judgment that accrues after entry of the judgement [sic] in any "suit" we defend; but our duty to pay interest ends when we have paid, offered to pay or deposited in court the part of the judgment that is within our Limit of Insurance.

The CIM package policy also contained an endorsement entitled "Automobile Dealers Legal Defense Cost Coverage" (with limits of $10,000 per suit and $50,000 annual aggregate per location) as follows:

We will pay all sums that you become obligated to pay as "legal defense costs" arising out of the cost to defend any "suit" during the policy period by or on behalf of your customers in which goods or services furnished by you are alleged to be defective.

We have the right and duty to defend any such "suit" but our duty to defend ends when the Limits of insurance stated in this endorsement have been exhausted or when, at our option, we elect to settle such "suit".

This "Automobile Dealers Legal Defense Cost Coverage" endorsement contained "Additional Definitions" as follows:

The following words have special meaning when used in this endorsement:

1. "Legal defense costs" means all legal fees and expenses incurred in defense of a covered "suit".

2. "Suit" means a civil proceeding, arbitration or mediation brought against you.

As always, the Garage Coverage also contained several potentially pertinent exclusions from coverage:

This insurance does not apply to any of the following:

1. Expected or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the "insured.". . . .

2. Contractual

Liability assumed under any contract or agreement. . . .

. . . .

4. Employee Indemnification and Employer's Liability

"Bodily injury" to:

a. An employee of the "insured" arising out of and in the course of employment by the "insured;"

. . . .

This exclusion applies:

(1) Whether the "insured" may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury. . . .

Likewise, the endorsement ("Broadened Coverage—Garages") contained an exclusion for contractual liability providing:

This insurance does not apply to:

1. Liability assumed under any contract or agreement.

Other provisions of the insurance agreement are discussed as necessary in the analysis section of this Order.

## C. The underlying dispute and the Tony Group's tenders of coverage to CIM.

The Court has reviewed the fact-intensive record. Rather than set forth all the details of the underlying dispute, the Court sets forth the relevant events that pertain to the insurance coverage questions.

Tony sells cars. In 1994, Kudo was essentially second-in-command to Tony. Sugibayashi also held executive positions in the Tony Group companies. Isobe and Okumura held lower-level executive positions. Tony allegedly intended to have his son eventually take over the business un-

der a "12–year plan." This led to the Kudo Group's members, along with others, negotiating with the Tony Group to purchase two of its dealerships to run on their own. These negotiations resulted in an August 25, 1994 Letter of Intent, and ensuing drafts of an Asset Purchase Agreement.

Sometime before November 1994, things went bad. Tony terminated Kudo and Sugibayashi on November 30, 1994; and terminated Isobe and Okumura in January 1995. In Tony's individual termination letters, he told each of the Kudo Group's members, among other things, "[he could] no longer enjoy your respect or trust."

The Kudo Group retained the law firm of Kobayashi Sugita & Goda. On December 16, 1994, attorney Bert Kobayashi sent a letter to the Tony Group's counsel, threatening to sue the Tony Group if it did not go forward with the Letter of Intent and Asset Purchase Agreement. Kobayashi's letter included an unfiled and unsigned copy of a complaint which Kobayashi was threatening to file if the Tony Group did not meet the letter's demands. This unfiled complaint contained counts against the Tony Group for (1) breach of contract, (2) fraud, (3) negligent misrepresentation, (4) interference with prospective economic advantage, (5) promissory estoppel, (6) breach of implied contract of employment, (7) violation of Haw.Rev.Stat. ch. 388 regarding severance pay, (8) intentional infliction of emotional distress, and (9) punitive damages. This complaint was never filed (although in 1995 it appeared in a different form as a counterclaim, as set forth to follow). The Tony Group contends that Kobayashi's threatened lawsuit, among other events, triggered coverage.

The Tony Group retained (or had already retained) the law firm of Torkildson, Katz, Fonseca, Jaffe, Moore & Hetherington ("Torkildson"). On December 21, 1994, attorney Edward Jaffe of Torkildson on behalf of the Tony Group, tendered the Kobayashi demand letter to CIM. CIM denied coverage by letter dated January 5, 1995.

Meanwhile, on December 30, 1994, the Tony Group fired the first shot. With Torkildson as counsel, the Tony Group filed a Demand for Arbitration with the American Arbitration Association against the Kudo Group. The arbitration demand made the following claims: (1) breach of contract (Kudo's and Sugibayashi's employment agreements); (2) gross negligence and willful misconduct (against Kudo and Sugibayashi); (3) breach of fiduciary duties (against Kudo and Sugibayashi); and (4) declaratory judgment regarding the arbitrability of the claims. The Tony Group characterizes this arbitration as a defensive maneuver. The parties eventually selected attorney David Fairbanks as the arbitrator. Extensive arbitration proceedings followed, including pre-hearing discovery and motions.

On June 26, 1995, the Kudo Group counterclaimed against the Tony Group in the arbitration proceedings. The 160–page (including exhibits) counterclaim was similar to the Kudo Group's threatened complaint of December 16, 1994. The counterclaim, however, was different in that it (1) added a claim for negligent infliction of emotional distress, (2) added a claim for unlawful retaliation against Isobe because she complained of sexual harassment, and (3) dropped the claim for interference with prospective advantage. Now facing counterclaims asserted against it, the Tony Group, through Torkildson, tendered the counterclaims to CIM on July 18, 1995. It pointed to the new count for negligent infliction of emotional distress and asked CIM to reevaluate its coverage decision. Some two weeks later, by letter of August 1, 1995, CIM again denied coverage.

Torkildson did not give up. After the August 1, 1995 denial, they followed up with additional letters to CIM seeking to clarify its position on coverage. They wrote letters dated August 15, 1995 and October 12, 1995. They pointed to possible defamation exposure of the Tony Group based upon a "self-publication" theory of defamation arising from Tony's ter-

mination letters (Kudo Group members would have to tell others that they were terminated because Tony considered them untrustworthy).[3] According to Torkildson, a defamation claim (if the Kudo Group made one) would potentially be covered as "personal injury" as defined in the "Broadened Coverage—Garages" endorsement. Torkildson also pointed to Isobe's unlawful retaliation count in the counterclaim, and argued that there was potential coverage under the expanded definition of "personal injury" in the Amended Personal Injury Liability Coverage endorsement. On October 21, 1995, CIM again denied coverage, referring to its previous denials.

Torkildson wrote again in January and February of 1996. In a January 1996 letter, Torkildson again stressed the discrimination counterclaim and also referred to potential defamation coverage. They asserted that "we believe that it is imperative that we be retained as independent legal counsel so that the interests of your Insured and of the Insurer are not jeopardized."[4]

On February 29, 1996, CIM acknowledged the most recent correspondence and informed the Tony Group that CIM had referred the matter to coverage counsel for a formal opinion. CIM indicated that some delay had occurred because the claim file was "at a long term storage facility."

On April 11, 1996, Torkildson wrote to CIM regarding a number of things, including an issue regarding coverage of some type of discrimination claim brought by *Okumura* (not Isobe). Okumura's claim was not the subject of the ongoing arbitration, and was apparently being handled in a different forum. CIM had agreed to cover Okumura's unrelated claim with ap-

pointed counsel, under a reservation of rights. In the April 11th letter, however, Torkildson pointed out that Isobe's (not Okumura's) discrimination count in the counterclaim was a covered claim in the pending arbitration, and that this obligated CIM to defend the entire counterclaim. Torkildson also (1) argued that CIM had no right to force the Tony Group to accept appointed counsel, (2) invoked the *Cumis*[5] doctrine, and (3) demanded that CIM pay Torkildson's fees as Torkildson was the Tony Group's counsel of choice. They apparently sought coverage for not only the counterclaim, but also for all fees incurred in pursuing the Tony Group's affirmative claims.

On May 6, 1996—nearly a year after the counterclaim was filed—CIM *accepted* the defense and investigation of Isobe's unlawful retaliation counterclaim, subject to a reservation of rights. CIM, however, advised that the other counts of the counterclaim were not covered, and asked Torkildson to allocate all its expenses incurred in defending the counterclaim. Regarding defamation, it asked for "any additional information [Torkildson] might have regarding the defamation and slander beyond that which is delineated in the counterclaim." CIM also notified Torkildson that it had retained attorney Elton John Bain to file a declaratory relief action to determine CIM's duties.

After a series of meetings and letters, on August 27, 1996, CIM paid the Tony Group $250,000, representing the limits (including defense costs) for one "occurrence" under the Amended Personal Injury Liability Coverage endorsement. This represented the policy's coverage for Isobe's unlawful retaliation claim against

---

**3.** Those letters which counsel was arguing were defamatory, so as to trigger potential coverage, were apparently drafted in part by counsel's firm in the first place.

**4.** This was apparently a reference to *Cumis* counsel. *See infra* note 5.

**5.** *See San Diego Navy Fed. Credit Union v. Cumis Ins. Soc., Inc.,* 162 Cal.App.3d 358,

208 Cal.Rptr. 494 (1984). Generally, *Cumis* issues arise when a complaint contains both covered and uncovered claims. *"Cumis* counsel" is an "independent" counsel (additional to appointed defense counsel), usually of an insured's choice, paid for by the insurer. The perceived need arises because there is a possibility of a conflict of interest when counsel is appointed by an insurer under a reservation of rights.

the Tony Group. CIM, however, asked that the amount be refunded with 8% interest if (referring to a declaratory relief action) "there is a final judgment which states that [the insureds] are not entitled to retain all or any portion of the $250,-000." From CIM's perspective, this ended CIM's duty to defend the counterclaim.[6]

Thereafter, Torkildson focused on the "Broadened Coverage–Garages" endorsement and the theoretically-possible self-publication defamation claim. In this regard, the precise factual allegations in the counterclaim are important. Paragraph 112 of the counterclaim stated:

> The very next day, MASAMITSU placed KUDO and SUGIBAYASHI on involuntary leave of absence and two weeks later, sent them letters terminating them from their employment, which letters are attached hereto as Exhibits "J" and "K" respectively.

No other mention was made in the counterclaim of the Kudo and Sugibayashi termination letters. On November 22, 1996, Torkildson wrote CIM a letter pointing to recent deposition testimony by Isobe regarding damage to her reputation from the termination. By letter from coverage counsel Bain dated December 9, 1996, CIM again denied coverage for that claim, although Bain asked Torkildson for further information regarding the Isobe deposition.

On March 19, 1997, CIM asked Torkildson for information on the upcoming arbitration, including copies of pleadings and discovery. It asked for permission to "monitor the arbitration hearings to determine what claims are made by the Kudo Group." The next day, Torkildson responded by refusing to allow a CIM representative to attend the arbitration, citing the late nature of the request and possible prejudice to the Tony Group by CIM's presence. They also stated that they did not have time to copy the volumes of arbitration material that CIM had requested.

They asked CIM for the name of a copying service which would bill CIM directly. Otherwise, Torkildson told CIM it would have to wait until after the arbitration because Torkildson needed access to the materials during those proceedings.

Arbitration hearings were to begin on April 7, 1997. By letter dated April 3, 1997, Kobayashi informed Torkildson that the Kudo Group was, among other things, going to be filing an *amended* counterclaim to add a count for defamation based on a self-publication theory. Of note, Kobayashi's letter referenced more than Tony's termination letter; it based a defamation claim on "defamatory statements verbally made by [the Tony Group] as well as those contained in the termination letters and notices of reprimands and related memoranda and correspondence[.]" The arbitrator allowed the substance of the amendment on the first day of the proceedings, the day before testimony was to begin in the arbitration.

Torkildson tendered the amended counterclaim to CIM on April 4 and 6, 1997. They demanded, on behalf of the Tony Group, reimbursement for all fees and costs incurred up until that time, as well as that CIM pay future defense costs and indemnify for covered claims.

By letter from attorney Bain of April 11, 1997, CIM acknowledged the latest demand. CIM asked for further information regarding the eve-of-hearing amendment, noting that it had not yet received the information from Torkildson that it had earlier requested in December of 1996. Torkildson responded and, not surprisingly, disputed much of CIM's letter.

The arbitration hearings lasted seven days and involved some 30 volumes of documents, aside from oral transcripts of the hearings themselves. Written arguments were filed in May and June of 1997. An arbitration decision was issued on July 23, 1997, followed by an arbitration order

---

**6.** The personal injury provision stated "Our duty to defend or settle ends when the Personal Injury and Advertising Injury Liability Coverage Limit of Insurance has been exhausted by payment of judgments or settlements."

regarding attorneys' fees and costs on September 2, 1997.

The arbitrator awarded the following: $148,874 to Kudo on Count III (promissory estoppel) of the First Amended Counterclaim; $354,485 to Sugibayashi on Count III (promissory estoppel); $41,863 to Isobe on Count VII (retaliatory discharge); and $15,479 to Okumura[7] on Count IX (defamation by self-publication). He awarded nothing to the Tony Group on its affirmative claims. In the subsequent order of September 2, 1997, he also awarded the Kudo Group attorneys' fees and costs of $1,542,392.95 ($1,361,113.45 for prevailing on arbitration in defense of the Tony Group's affirmative claims and $181,279 in attorneys' fees under Haw.Rev.Stat. § 607–14 based upon the Kudo Group's recovery on the counterclaims).

Meanwhile, on April 25, 1997—after the close of the evidentiary phase of the arbitration, but before briefing and written argument were due—CIM accepted the defense of the amended counterclaim. Its position was (and is) that there was no duty to defend until the amended counterclaim was actually filed on April 7, 1997. CIM agreed to appoint *new* counsel to defend the counterclaim beginning on April 24, 1997 and to pay Torkildson's fees for the period from April 7, 1997 until April 23, 1997. Torkildson was to continue to prosecute the Tony Group's affirmative claims. CIM asked Torkildson to cooperate with new counsel and to segregate and allocate their fees accordingly.

By letter of April 30, 1997, Torkildson responded by, among other things, refusing to consent to CIM's request to change counsel. They pointed to the late nature of the proceedings (after the close of evidence). They contended that the Tony Group would be deprived of the counsel of its choice, Torkildson (apparently referring to the *Cumis* doctrine). They reasserted their position that CIM was obligated to pay for all attorneys' fees and costs incurred by the Tony Group in the underlying dispute from December of 1994, both on the Tony Group's affirmative claims and in defense of the Kudo Group's counterclaims.

After the arbitration awards were issued, Torkildson again wrote to CIM. Presumably, given the amount of the arbitration awards, insurance coverage issues assumed a heightened urgency. On September 2, 1997 (the same day the arbitrator issued the order regarding fees) Torkildson made a new tender to CIM of the entire $2,103,093 award. This tender, according to the letter, was in addition to their previous tenders. Torkildson demanded (1) indemnification of the Tony Group, and (2) further defense, including seeking to vacate the arbitration award and opposing efforts to confirm that award. They stated that if CIM unconditionally acknowledged CIM's indemnification obligation, then the Tony Group would consent to the appointment of "any competent counsel" of CIM's choosing. Otherwise, Torkildson again specifically invoked the *Cumis* doctrine and asserted that the Tony Group had the right to continue to be represented by Torkildson at CIM's expense.

By letter of September 8, 1997, CIM wrote back and again denied coverage of all but the defamation counterclaim. Its coverage counsel's letter "presented to tender" the $15,479 awarded to Okumura for indemnification under the broadened personal injury endorsement. Communications then ensued regarding the meaning of "presented to tender" and any conditions placed on acceptance of that payment. For whatever reason, the $15,479 amount was not actually paid by CIM until August 12, 1998 (after these actions were filed).

Soon after the arbitrator's decisions, the Kudo Group and the Tony Group filed motions in the First Circuit Court to con-

---

7. No defamation award was given to Isobe, who had been the subject of earlier letters and deposition testimony.

firm and to vacate respectively. Then, on September 24, 1997, they settled. The Tony Group paid the Kudo Group $2 million in full satisfaction of the arbitration award. During this entire process the Tony Group incurred attorneys' fees of some $3 million (not to mention fees incurred in the instant action). The underlying dispute thus cost the Tony Group some $5 million. The instant coverage and bad faith actions followed.

## ANALYSIS

■ Basic Hawaii insurance law provides that a duty to defend "arises whenever there is a potential for indemnification liability of the insurer to the insured." *Hawaiian Holiday Macadamia Nut Co., Inc. v. Industrial Indem. Co.,* 76 Hawai'i 166, 169, 872 P.2d 230, 233 (1994). "Furthermore, where a suit raises a potential for indemnification liability of the insurer to the insured, the insurer has a duty to accept the defense of the entire suit even though other claims of the complaint fall outside the policy's coverage." *Id.* (quotation omitted).

The duty to defend "is limited to situations where the pleadings have alleged claims for relief which fall within the terms for coverage of the insurance contract. 'Where pleadings fail to allege any basis for recovery within the coverage clause, the insurer has no obligation to defend.'" *Id.* (citation omitted).

■ The focus is on the alleged claims and facts. "[I]f the plaintiff's [underlying] complaint against the insured alleged facts which would have supported a recovery covered by the policy, it was the duty of the defendant [insurer] to undertake the defense, until it could confine the claim to a recovery that the policy did not cover." *Allstate Ins. Co. v. Hui,* 57 F.Supp.2d 1039, 1043 (D.Haw.1999) (quoting *Commerce & Industry Ins. Co. v. Bank of Hawaii,* 73 Haw. 322, 326, 832 P.2d 733 (1992)). "Thus, an insurance company has an obligation to investigate to determine whether a third party's action raises a potential for coverage and thus implicates

its duty to defend when '(1) the allegations in the pleadings should alert the insurer that there is a potential for coverage . . .; (2) the allegations differ from facts the insurer knows or can readily determine; or (3) the allegations are ambiguous.'" *Id.* (quoting *Bayudan v. Tradewind· Ins. Co.,* 87 Hawai'i 379, 380, 957 P.2d 1061 (App. 1998)).

The parties to an insurance contract, like other contracts, are bound by the policy's terms. Insurance policies are therefore governed by general rules of contract construction, with terms interpreted according to their plain, ordinary, and accepted sense in common speech unless a different meaning is intended in the policy. *See Dawes v. First Ins. Co. of Hawaii,* 77 Hawai'i 117, 121, 883 P.2d 38, 42 (1994). Hawaii courts construe insurance contracts according to the entirety of the terms and conditions of the policy. *See AIG Hawaii Ins. Co., v. Estate of Caraang,* 74 Haw. 620, 630, 851 P.2d 321, 326 (1993) (citations omitted).

To the extent this case raises issues of first impression, this Court, sitting in diversity, "must use [its] best judgment to predict how the Hawaii Supreme Court would decide [the] issue." *Helfand v. Gerson,* 105 F.3d 530, 537 (9th Cir.1997). "In so doing, a federal court may be aided by looking to well-reasoned decisions from other jurisdictions." *Takahashi v. Loomis Armored Car Service,* 625 F.2d 314, 316 (9th Cir.1980).

### A. Garage Operations.

Initially, the Court finds that the underlying dispute, and claims arising out of it, fit within the policy's definition of "garage operations." The management, leadership, administrative, and employment-type issues involved in the underlying dispute are "operations necessary or incidental to a garage business" as applied to the Tony Group's operations.

## B. The Kobayashi demand letter.

■ The Tony Group contends that the Kobayashi demand letter of December 16, 1994, threatening to file suit on behalf of the Kudo Group, was a potentially covered claim that obligated CIM to defend. The Tony Group asserts that its affirmative arbitration instituted on December 30, 1994 was a defensive strategy, and therefore CIM is required to indemnify it for all of Torkildson's fees incurred in the underlying arbitration. The Court disagrees.

The plain and unambiguous language of the CIM policy requires a duty to defend "suits," not threatened suits:

We have the right and duty to defend any "suit" asking for these damages. However, we have no duty to defend "suits" for "bodily injury" or "property damage" not covered by this Coverage Form. . . .

. . . .

J. "Suit" means a civil proceeding in which damages because of "bodily injury" of [sic, or] "property damages" to which this insurance applies are alleged. "Suit" includes an arbitration proceeding alleging such damages to which you must submit or submit with our consent.

Under Hawaii insurance law, therefore, the Kobayashi demand letter triggered no duty to defend. *See Dawes,* 77 Hawai'i at 121, 883 P.2d at 42 (policy's terms interpreted according to plain language); *Sentinel Ins. Co. v. First Insurance Co. of Hawaii,* 76 Hawai'i 277, 299, 875 P.2d 894, 916 (1994) ("we must respect the plain terms of the insurance policy and not create ambiguity where none exists") (citation and internal quotation marks omitted). Other types of policy language might require an insurer to defend against threatened litigation. *Compare Finley v. Home Insurance Co.,* 90 Hawai'i 25, 27 n. 3, 975 P.2d 1145, 1147 n. 3 (1998) (dealing with insurance policy language providing that "We have the right and duty to defend at our expense *any claim, proceeding or suit against you* [.]") (emphasis added). Although CIM might have other duties regarding "claims," CIM's policy language

here plainly requires a duty to defend only against an actual "suit."

Moreover, this plain language interpretation is supported by persuasive case law from other jurisdictions. *See Foster–Gardner, Inc. v. National Union Fire Ins. Co.,* 18 Cal.4th 857, 77 Cal.Rptr.2d 107, 959 P.2d 265, 285–86 (1998) (establishing bright-line rule, reasoning that "[p]rior to the filing of a complaint, there is nothing for the insured to tender defense of, and hence no duty to defend arises"); *City of Edgerton v. General Cas. Co. of Wisconsin,* 184 Wis.2d 750, 517 N.W.2d 463, 477 (1994) ("the word 'suit' is easily understood and unambiguous to a reasonable policyholder. . . . Either there is a suit or there is not. When there is no suit, there is no duty to defend.").

## C. The June 26, 1995 counterclaim.

### 1. *Fraud, Misrepresentation, Estoppel, and Breach of Contract.*

■ The Kudo Group's June 26, 1995 counterclaim asserted counts against the Tony Group for, inter alia, fraud, misrepresentation, promissory estoppel, and breach of contract. For purposes of coverage, the counterclaim constituted a "suit." None of those specific counts, however, triggered a duty to defend.

The underlying dispute was a business disagreement evidently involving personal animosity. Breaches of agreements or contracts (or related promissory estoppel claims) were alleged. These contract, or contract-like, claims are not covered. *See WDC Venture v. Hartford Acc. and Indem. Co.,* 938 F.Supp. 671, 678–79 (D.Haw. 1996) ("coverage of such contract-based allegations would be contrary to public policy"). Indeed, the CIM policy contained specific exclusions for "liability assumed under any contract or agreement."

■ Similarly, there is no coverage for fraud. *See Hawaiian Holiday Macadamia Nut,* 76 Hawai'i at 170–71, 872 P.2d at 234–35 (holding that fraud is not an "occurrence" in a CGL policy). The negligent

misrepresentation claim also did not trigger a duty to defend. Under the factual allegations of the counterclaim, it is clear that any claim of such "negligence" stemmed from intentional acts or contract-based claims. *Cf. Bayudan,* 87 Hawai'i at 388, 957 P.2d at 1070 ("insurer 'had no duty to indemnify or defend ... for the additional reason that the damages claimed as a result of [the insured's] negligence actually stemmed directly from the sexual assaults which fall within the intentional acts exclusion of the policy.' ") (citation omitted). "[A]n insurer's duty to defend is not triggered by labeling one claim in a complaint 'negligence' when the facts in the complaint do not demonstrate alleged loss resulting from negligence or alleged loss caused by an occurrence, but instead demonstrate alleged losses for which there was no duty to defend." *Id.* (citation and internal quotation marks omitted). *See also Hui,* 57 F.Supp.2d at 1046–47 (no coverage because cause of action for material misrepresentation rests on same facts on which plaintiff's claim fraud). Accordingly, there is no coverage. *See WDC Venture,* 938 F.Supp. at 678–79 (finding no coverage over, inter alia, negligence and negligent misrepresentation claims where the insured sought recovery "for tort and contractual claims *that arise from the contractual relationship* ") (emphasis in original). For that same reason, the intentional infliction of emotional distress count did not trigger potential liability.

### 2. *Negligent Infliction of Emotional Distress*

■ Next, the Tony Group contends that the Kudo Group's counterclaim of June 26, 1995 triggered coverage because it contained a count for negligent infliction of emotional distress ("NIED"). The Court disagrees.

Again, the underlying action was essentially a business dispute. The counts of the counterclaim were for breach of contract or promissory estoppel theories, as well as for fraud and misrepresentation. The employment and discrimination claims appeared to reflect the personal nature of the dispute. This was not a personal-injury-type tort occurrence. There was, for example, no assault or death or "physical injury" involving blood. Thus, although not dispositive of the coverage question, the counterclaim contained no legitimate count for NIED. *See Ross v. Stouffer Hotel Co.,* 76 Hawai'i 454, 465–66, 879 P.2d 1037, 1048–49 (1994) (no claim for NIED absent physical injury to property or a person). *Cf. Francis v. Lee Enterprises, Inc.,* 89 Hawai'i 234, 240, 971 P.2d 707, 713 (1999) ("damages for emotional distress [in contract actions] may be recoverable, but only where the parties specifically provide for them in the contract or where the nature of the contract indicates that such damages are within the contemplation or expectation of the parties.").

More importantly, the policy's expanded definition of "personal injury" (which included emotional distress damages) in the "Amended Personal Injury Liability Coverage" does not help the Tony Group. That coverage provided "[t]he definition of 'Personal Injury' is expanded to include: Injury from mental anguish or injury; shock or humiliation." However, under the original "Broadened Coverage—Garage" endorsement (which was in turn expanded by the "Amended Personal Injury Liability Coverage"), such mental injury must still arise out of a covered offense. It did not. The emotional distress was asserted as a separate tort (breach of duty of reasonable care resulting in emotional distress). At best, it arose from the previously-pled (uncovered) fraud, misrepresentation, contract, or promissory estoppel claims.

Finally, even if emotional distress was otherwise covered as "bodily injury," the Kudo Group's emotional distress claims would be excluded under the "Employee Indemnification and Employer's Liability" exclusion. It excludes coverage for "bodily injury" to "[a]n employee of the 'insured' arising out of and in the course of employment by the 'insured.' " The Kudo

Group's counterclaim for emotional distress arose out of the members' course of employment with the Tony Group. It would have been excluded.

### 3. The Count by Isobe for unlawful retaliation

As explained earlier, CIM eventually accepted the Tony Group's tender of a defense of the Kudo Group's counterclaim based upon Isobe's allegations that the Tony Group unlawfully retaliated against her when she complained about sexual harassment. It defended subject to a reservation of rights. CIM, however, did not accept this tender until nearly a year after the counterclaim was filed. Isobe's discrimination-type allegation was covered under the expanded definition of "personal injury" in the Amended Personal Injury Liability Coverage endorsement. As set forth earlier, the discrimination coverage contained this limitation:

> "Personal Injury" arising from discrimination is limited to $250,000 for any one "occurrence", and a total of $1,000,000 for any one annual policy term. Defense costs paid for any one claim arising from discrimination will reduce the limits of insurance for this coverage.

Under this provision, CIM eventually paid the Tony Group $250,000, subject to some reservations. CIM contends that this payment ended its duty to defend and otherwise satisfied its contractual duties, at least as to this aspect of the policy. The Tony Group counters by arguing that the Isobe discrimination count consisted of multiple "occurrences" and that therefore the coverage is not limited to $250,000, but rather is at least $1 million.

■ The Court finds that the Isobe allegation constituted one "occurrence." The count alleged that Isobe's "privileges of employment were adversely affected" and that she was wrongfully discharged in retaliation for objecting to unlawful sexual harassment in the workplace. The allega-

tions described a pattern and practice of tolerating harassment. "Occurrence" was defined in the CGL coverage as "continuous or repeated exposure to substantially the same general harmful conditions." Moreover, even if "occurrence" was not specifically defined in the *garage* portions of the policy, the counterclaim's allegations only give rise to one "occurrence" under a plain English definition of the term. Further, as CIM argues, most courts hold that the number of occurrences is determined by referring to the cause of the damages, not the number of claims or injuries. *See, e.g., CSX Transportation Inc. v. Continental Ins. Co.,* 343 Md. 216, 680 A.2d 1082, 1091–92 (1996) (citing numerous cases). Accordingly, the policy is limited to $250,000 for both defense and indemnification of the Isobe counterclaim.[8]

■ That, however, does not end things. Even if CIM's interpretation regarding coverage was ultimately correct, there are still questions regarding CIM's *handling* of the claim. Under Hawaii law, "[a]n insurer may be liable [for bad faith] for the improper conduct of the defense of its insured even though it is ultimately determined that the insurer had no duty to defend or indemnify under the terms of the policy." *Delmonte v. State Farm Fire & Cas. Co.,* 90 Hawai'i 39, 55, 975 P.2d 1159, 1175 (1999) (quotation omitted). This is especially so where an insurer defends subject to a reservation of rights in situations with both covered and uncovered claims. *See Finley v. Home Insurance Co.,* 90 Hawai'i 25, 36–37, 975 P.2d 1145, 1156–57 (1998). *Finley,* among other things, rejected the *Cumis* doctrine in Hawaii. More on this later. Most important for present purposes, however, *Finley* adopted an "enhanced" standard of good faith when an insurer defends subject to a reservation of rights. An insurer's conduct is subject to higher scrutiny.

---

8. Further, the garage operations coverage limit of insurance clause provided that "All 'bodily injury' and 'property damage' result-

ing from continuous or repeated exposure to substantially the same conditions will be considered as resulting from one 'accident.' "

[T]he potential conflicts of interest between insurer and insured inherent in this type of defense mandate an even higher standard: an insurance company must fulfill an enhanced obligation to its insured as part of its duty of good faith.... This enhanced obligation is fulfilled by meeting specific criteria. First, the company must thoroughly investigate the cause of the insured's accident and the nature and severity of the plaintiff's injuries. Second, it must retain competent defense counsel for the insured [subject to rejection by the insured].... Third, the company has the responsibility for fully informing the insured not only of the reservation-of-rights defense itself, but of all developments relevant to his policy coverage and the progress of his lawsuit.... Finally, an insurance company must refrain from engaging in any action which would demonstrate a greater concern for the insurer's monetary interest than for the insured's financial risk.

*Id.* at 36–37, 975 P.2d at 1156–57 (quoting *Tank v. State Farm Fire & Cas. Co.,* 105 Wash.2d 381, 715 P.2d 1133, 1137 (1986)).

 Given this "enhanced" scrutiny, this Court is unwilling to dismiss the Tony Group's bad faith claims on the record now before the Court. Particularly significant is CIM's delay of nearly a year in recognizing its duty to defend Isobe's discrimination claim. "An unreasonable delay in payment of benefits will warrant recovery for compensatory damages under [Hawaii bad faith law]." *Best Place, Inc. v. Penn America Ins. Co.,* 82 Hawai‘i 120, 133, 920 P.2d 334, 347 (1996) (citing *McCormick v. Sentinel Life Ins. Co.,* 153 Cal.App.3d 1030, 200 Cal.Rptr. 732 (1984)). Defending the covered discrimination claim in turn would have triggered CIM's duty to defend the entire counterclaim. *See, e.g., Hawaiian Holiday Macadamia Nut,* 76 Hawai‘i at 169, 872 P.2d at 233. Thus, CIM delayed an entire defense, presumably well before the $250,000 limit for defense and indemnification was exhausted. CIM's late tender of the limits does not necessarily cure things.

While a year delay by itself does not necessarily constitute bad faith, it does raise questions under the record before the Court regarding the scope and adequacy of CIM's investigation. For example, in the letter of February 29, 1996 which notified the Tony Group that CIM was referring the matter to coverage counsel, CIM claimed that "[u]nfortunately, there was some delay in matching up [Torkildson's] correspondence as the claim file was off site at a long term storage facility." One wonders why the file was in "long term storage" given the original tender in late–1994 and Torkildson's regular letters (and CIM's concurrent rejections) ever since then.

In sum, although the Court agrees with CIM's position on coverage regarding the discrimination claim, the Court DENIES CIM's motion to the extent it seeks summary judgment on the Tony Group's charges of bad faith.

### D. Defamation coverage

The Court next addresses whether (or when) a duty to defend against the self-publication defamation claim arose. CIM's position is that the duty to defend did not arise until the Kudo Group's counterclaim was actually amended in early-April of 1997. The Tony Group, however, asserts that coverage was triggered at the latest when the original counterclaim was filed in June of 1995. The Tony Group invokes what it calls the "legal ambiguity" rule applied in *Sentinel Ins. Co. v. First Insurance Co. of Hawaii,* 76 Hawai‘i 277, 299, 875 P.2d 894, 916 (1994). Its position essentially is that because Hawaii had not specifically *rejected* a self-publication defamation theory, it was *possible* that the Kudo Group could recover for such a claim. Given the "potential" indemnification liability, so the Tony Group argues, CIM had a duty to defend the entire counterclaim before it was amended.

 In *Sentinel,* the Hawaii Supreme Court addressed, among other things, which theory of damages (a "manifestation

of loss" theory, an "injury-in-fact" theory, or an "exposure" theory) for insurance coverage purposes would apply in progressive property loss situations. "Progressive loss" occurs when damage continues progressively over long periods often due to "latent defects" such as asbestos or environmental problems. Coverage issues often arise if different insurance policies and different policy periods are potentially at issue. The Hawaii Supreme Court found a duty to defend such a situation based upon a "legal ambiguity." The *Sentinel* court reasoned:

> ... in order to determine whether First Insurance breached its duty to defend, we need not resolve the [legal questions]. The mere fact that the answers to those questions in this jurisdiction were not then and are not presently conclusively answered demonstrates that, based on the allegations in the underlying action, it was possible that the Honofed entities would be entitled to indemnification under the First Insurance policies.

*Id.* The Hawaii Supreme Court's reasoning in *Sentinel* indicates that coverage can arise where there is a *legal* uncertainty in Hawaii law, in addition to a *factual* uncertainty in the case.[9]

*Sentinel* is distinguishable. In that case the potentially covered claim for damages *was* asserted in the underlying action. There was a duty to defend because that claim was potentially covered given the "legal uncertainty" in a relevant question of law. That is, there was potential coverage in *Sentinel* even though (or precisely because) recovery on that underlying claim would have required recognizing and applying a "new" (under Hawaii law) legal theory (an "injury-in-fact trigger" for progressive property loss). *See Sentinel,* 76 Hawai'i at 290, 875 P.2d at 907.

■ Here, in contrast, recovery for defamation would only be possible on the Kudo Group's particular counterclaim if such a claim were actually made. Such a defamation-by-self-publication theory would indeed be a novel and unrecognized cause-of-action under Hawaii law. *See Ingle v. Liberty House, Inc.,* Civ. No. 94–0787(3) 1995 WL 757746, *2 (2nd Cir.Ct, Oct. 12, 1995) ("Hawaii has never adopted the doctrine of self-publication, and this court declines to adopt the minority view that publication may occur by 'self defamation.'"); *Sullivan v. Baptist Memorial Hospital,* 995 S.W.2d 569, 573 (Tenn.1999) ("The majority of states addressing the issue do not recognize self-publication as constituting publication for defamation purposes"). Nevertheless, under the "legal ambiguity" theory espoused in *Sentinel,* the defamation claim (once made) would still trigger potential coverage.

Merely because a Hawaii court, or Hawaii arbitrator, could recognize such a defamation theory, however, did not automatically trigger coverage under the allegations in the Kudo Group's counterclaim. The Tony Group reads too much into *Sentinel. Sentinel* does not require an insurer to investigate every tendered situation, to uncover all facts arising out of that situation, and to survey every body of Anglo–Saxon common law and ascertain whether there is any possible theory of recovery not yet adopted or rejected in Hawaii—especially for theories not asserted in the underlying action. Such a requirement would effectively cause insurers to become attorneys for the underlying plaintiff. It would require an insurer to do a better job investigating the facts and law than the underlying plaintiff itself. An insurer is required to review and fully investigate the allegations in the complaint against its insured; it is not, how-

---

9. This appears to be a minority view. *See Waller v. Truck Insurance Exchange, Inc.,* 11 Cal.4th 1, 44 Cal.Rptr.2d 370, 900 P.2d 619, 632 (1995) ("This has never been the law") (citing *McLaughlin v. National Union Fire Ins. Co.,* 23 Cal.App.4th 1132, 29 Cal.Rptr.2d 559, 570 (1994) (duty to defend depends on fact in complaint; where only potential for liability turns on resolution of legal question, there is no duty to defend)).

ever, required to litigate the case against its insured.

■ A fundamental principle that should underlie any statement of Hawaii insurance law is that a plaintiff is the master of its claim. The underlying complaint against an insured defines the scope of the action, and, at least initially, of the insurer's investigation. A plaintiff for any number of plausible reasons may choose purposely not to assert certain facts or causes of action. The Tony Group's interpretation of *Sentinel's* "legal ambiguity" theory would mean that novel and remotely-possible claims (claims which are neither asserted nor addressed in Hawaii law) would trigger coverage over an otherwise non-covered action. An insurer would be defending against phantom claims. Given a constantly evolving common law, this Court in applying Hawaii law is unwilling to read as much into *Sentinel.*

■ The Tony Group points out that an arbitrator has even more flexibility to recognize novel claims than a court does. Indeed, an arbitrator's award cannot be vacated even if "mistakes" were made in applying the law. *See University of Hawaii Prof'l Assembly ex. rel. Daeufer v. University of Hawaii,* 66 Haw. 214, 225, 659 P.2d 720, 728 (1983) (an arbitration award cannot be vacated for an error of law; vacating of awards limited to factors in Haw.Rev.Stat. § 658–9). The Tony Group implies that therefore, under *Sentinel,* there was clearly a "potential" for liability because the underlying dispute was in arbitration. The Court rejects this idea. Carried to its logical conclusion, coverage would arise in *any* arbitration *regardless* of the subject matter. This cannot be the law.

Thus, we return to the fundamental question which is simply whether the factual and legal allegations in the Kudo Group's original counterclaim against the Tony Group were sufficient to trigger CIM's duty to defend a defamation claim. *See Commerce & Industry Ins.,* 73 Haw.

at 326, 832 P.2d at 736. The Court's answer is no. The factual allegations in the original counterclaim did not trigger coverage under a self-publication defamation theory. All the counterclaim said was that Tony terminated Kudo and Sugibayashi. Merely attaching the letters as exhibits did not create a factual allegation that Tony defamed Kudo or Sugibayashi. Moreover, the counterclaim said nothing about Isobe and Okumura. (Isobe was the subject of the deposition in Torkildson's letter of November 22, 1996, and Okumura was actually awarded damages under that theory.) No letters terminating Isobe and Okumura were ever made part of the counterclaim. From the Court's lengthy review of the record, the focus was on the misrepresentation and estoppel aspects; any claim for defamation was at best collateral.

Despite Torkildson's letters to the contrary, it was only after the arbitrator allowed the amendment to the counterclaim that potential indemnification liability for defamation arose. Only then was a duty to defend (based upon defamation) triggered, because only then were the allegations sufficient. The record contains no information that CIM had any *actual* knowledge that the Kudo Group could or would seek recovery for defamation. Indeed, according to deposition testimony, the Kobayashi firm added the claim late in the game when "one of the associates threw [it] out" shortly before the arbitration hearing. In short, the Court agrees with CIM's interpretation of its policy regarding the defamation count.

Again that does not end things. The situation becomes muddled because CIM, regardless of the defamation question, had a duty to defend the entire counterclaim based upon the earlier-analyzed discrimination claim. That duty arose as early as June of 1995.[10] The Court will not speculate as to what information CIM might or might not have discovered from an appointed defense counsel if CIM defended

---

**10.** The issue is not moot, however, because the defense costs for the defamation claim were not limited by the policy, as were the costs for defending a discrimination suit.

earlier—that is, information regarding whether the Kudo Group could and might indeed have been intending to actually assert *another* covered claim (i.e., defamation) under a different policy provision.[11] Notably, Torkildson's letters did not notify CIM until April 1997 that the Kobayashi firm was actually intending to file or even considering filing a defamation claim; rather they argued that Tony's termination letters could be defamatory under an unrecognized theory of defamation. Suffice it to say that there are still questions regarding CIM's handling of the claim, including CIM's actual knowledge of the facts of the underlying dispute. *See Delmonte,* 90 Hawai'i at 55, 975 P.2d at 1175.

This leads to *Cumis.* Recall that on April 27, 1997, Torkildson on behalf of the Tony Group *rejected* CIM's proposed appointment of defense counsel (or to take over the defense) for the counterclaim. Torkildson also again asked to be appointed as independent *Cumis* counsel.

 Since then, however, the Hawaii Supreme Court has decided *Finley* and rejected the *Cumis* counsel requirement. *See Finley,* 90 Hawai'i at 31–32, 975 P.2d at 1151–52 ("we are convinced that the best result is to refrain from interfering with the insurer's contractual right to select counsel"). There is no requirement when reserving rights that an insurer fund a separate "independent" counsel of an insured's choice. *Finley* also held that an insured is free to reject the appointed counsel. If it does so, however, it waives the right to defense fees:

> If the insured chooses to conduct its own defense, the insured is responsible for all attorneys' fees related thereto. The insurer is still potentially liable for indemnification for a judgment within the scope of insurance coverage. However, having refused the contractual terms of

the policy, the insured foregoes its right to compensation for defense fees.

90 Hawai'i at 35, 975 P.2d at 1155.

CIM thus argues that, under *Finley,* the Tony Group waived its right to any defense fees for the defense of the counterclaim from April 7, 1997 onward. Having rejected CIM's proposed defense arrangement as set forth in CIM's April 25, 1997 letter, the Tony Group "[chose] to conduct its own defense." *Id.* CIM further contends that it fulfilled its separate duty to indemnify by its (conditional) payment of $15,479 awarded for defamation. It seeks a declaration that it met its contractual duties.

 *Finley* cuts two ways. As set forth earlier, it also recognized an enhanced standard of good faith. *See* 90 Hawai'i at 36–37, 975 P.2d at 1156–57. Given this higher standard, the Court is unwilling to dismiss the Tony Group's bad faith counts on the record before the Court. In particular, without more, the Court questions the reasonableness of CIM's proposal to substitute new defense counsel *after* the close of the evidentiary portion of the arbitration. Under a different factual situation, such an arrangement might conceivably be appropriate, even with similar timing. Here, however, given (1) the protracted coverage dispute, (2) the complexity and length of the arbitration proceedings, and (3) that at least one other count of the counterclaim had already been covered, the reasonableness of the proposed late substitution of counsel appears questionable. Even if *Finley* could have been anticipated, CIM's proposal effectively gave the Tony Group no choice but to reject the insurer's terms. Add the conditional indemnification of the $15,479 to the mix.[12] There are questions whether CIM met its "enhanced" duty under *Finley.* The Court DENIES CIM's motion to the extent it seeks summary judgment on the

---

11. As stated above, the record actually indicates the decision to file an amended counterclaim was made at the last minute.

12. Again, for reasons not apparent to the Court, the $15,479 was not paid until August 1998.

bad faith counts regarding the defamation coverage question.

### E. "Supplementary Payments"

 Next, the Tony Group contends that regardless of these rulings, CIM is liable to pay a good portion of the $1.5 million in attorneys' fees awarded by the arbitrator. It also seeks interest. It cites the "supplementary payments" coverage extension in the garage endorsements. As set forth earlier, that extension provided:

a. Supplementary Payments. *In addition to the Limit of Insurance,* we will pay for the "insured:"

. . . .

(5) *All costs taxed against the "insured"* in any "suit" we defend.

(6) All interest on the full amount of any judgment that accrues after entry of the judgement [sic] in any "suit" we defend; but our duty to pay interest ends when we have paid, offered to pay or deposited in court the part of the judgment that is within our Limit of Insurance. (emphasis added)

The Tony Group contends that the attorneys' fees awarded to the Kudo Group were "costs taxed against the insured." It claims that "costs" plainly includes "attorneys' fees." It also cites as support the definition of "legal defense costs" ("all legal fees and expenses incurred in defense of a covered 'suit' ") in the "additional definitions" section of the "Automobile Dealers Legal Defense Cost Coverage Endorsement."

The Court finds otherwise. "Costs taxed" read in context plainly refers to amounts commonly taxed by courts in suits. The policy could have also provided for "attorneys' fees" awarded against an insured in any suit the insurer defends. It did not. This reading comports with the common understanding used by Hawaii courts in "suits" (which is the relevant context to understand the meaning of "costs taxed . . . in any suit"). *See Collins v. South Seas Jeep Eagle,* 87 Hawai'i 86, 952 P.2d 374 (1997) ("costs" does not include attorneys' fees); *see also Finley,* 90

Hawai'i 25, 39, 975 P.2d at 1159 ("we perceive a rational basis for differentiation between appellate review of a circuit court's award of taxable costs and attorneys' fees . . . . a request for attorneys' fees is generally far more complex than a request for costs").

The "Automobile Dealers Legal Defense Cost Coverage Endorsement" definition of "legal defense costs" is irrelevant for purposes of the supplementary payments provision. The "legal defense costs" specifically refers to suits "in which goods or services furnished by [the insured] are alleged to be defective." The underlying dispute did not concern products liability. Moreover, the definition refers to attorneys' fees "incurred in defense of a covered 'suit' —not to fees taxed against the insured."

The arbitrator's September 2, 1997 award addressed both attorneys' fees and costs. Fortunately, the arbitrator allocated the fees and costs between the Tony Group's affirmative claims and the Kudo Group's counterclaims. In this regard, the September 2, 1997 award specifically "taxed" against the Tony Group "costs" on the counterclaim of $45,575.00. CIM is liable for that portion under the Supplementary Payments extension.

As for interest, CIM's duty to pay interest on the $15,479 (as well as on the $45,575.00 of "costs" just discussed) ended "when [CIM] paid, offered to pay or deposited in court the part of the judgment that is within our Limit of Insurance." Although CIM arguably "offered to pay" the $15,479 judgment in September of 1997, the adequacy of that offer is unclear from the record. The record reflects that CIM did not actually pay the $15,479 judgment until August of 1998. There is a factual question regarding whether CIM's September 1997 "presentment to tender" was sufficient to end its duty to pay supplementary interest on the judgment. And, regardless, CIM did not pay any interest on the $45,575.00 of "costs." A final calculation of interest due under the Supple-

mentary Payments extension remains open.

**F. MIC and MICPAC**

The Court GRANTS CIM's motion to the extent it seeks summary judgment as to claims against defendant Motors Insurance Corporation ("MIC") in Civ. No. 98–00114SPK. The uncontradicted evidence is that MIC is and was the claims handler for the subject policy. It did not have a contract with the Tony Group. It cannot be liable to the Tony Group for bad faith. *See Gruenberg v. Aetna Ins. Co.,* 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032, 1038–39 (1973) (In Bank) ("Obviously, the non-insurer defendants were not parties to the agreements for insurance; therefore, they are not, as such, subject to an implied duty of good faith and fair dealing"); *Moore v. Allstate Ins. Co.,* 6 Haw.App. 646, 651, 736 P.2d 73, 77 (1987).

Finally, CIM seeks to dismiss MIC Property and Casualty Insurance Corporation ("MICPAC") from Civ. No. 98–00114SPK. MICPAC is evidently CIM's parent. It may have some sort of potential joint liability as a co-insurer because the various policy documents often refer to both MICPAC and CIM as insurers. Although the Tony Group's complaint has alleged that MICPAC is liable under an alter ego theory, it has presented no evidence in support. It asks for more time for discovery under Rule 56(f). There is no dispute that CIM is a main carrier and CIM has taken the lead in litigating the insurer's positions. In any event, there are enough open questions to deny the motion as to MICPAC at this time.

**G. Tortious Breach of Contract**

█ The Tony Group's complaint, in addition to counts for bad faith, includes a count for "tortious breach of contract." Hawaii has subsequently held that there is no such cause of action. *See Francis v. Lee Enterprises, Inc.,* 89 Hawai'i 234, 971 P.2d 707 (1999). *Francis,* however, was careful to distinguish the tort of bad faith. *Id.* at 238–39, 971 P.2d at 711–12. Accordingly, the Court DISMISSES the count seeking damages for tortious breach of contract.

*CONCLUSION*

To summarize this complicated action:

(1) On the various declaratory relief counts in both Civ. No. 97–1533SPK and Civ. No. 98–00114SPK, this Order speaks for itself regarding the Court's various interpretations of the insurance policy as applied to the underlying dispute;

(2) the Court DENIES CIM's Motion to the extent it seeks summary judgment on Counts V and VII of the Tony Group's Complaint in Civ. No. 98–00114SPK;

(3) the Court DISMISSES Count VI ("Tortious Breach of Contract") in Civ. No. 98–00114SPK.

IT IS SO ORDERED.