**CIM INSURANCE CORPORATION, Plaintiff,**

v.

**MIDPAC AUTO CENTER, INC.; Inter Pacific Motors, Inc., d.b.a. Orchid Isle Auto Center; Joseph Walsh Hanley; Katherine S. Hanley; and Clarendon National Insurance Company, Defendants.**

**No. Civ. 99–00516DAE BMK.**

United States District Court,
D. Hawai'i.

July 21, 2000.

---

Peter W. Olson, Cades Schutte Fleming & Wright, Honolulu, HI, for CIM Insurance Corporation, plaintiff.

David W. Proudfoot, Belles Graham & Proudfoot, Lihue, HI, for Midpac Auto Center, Inc., Inter Pacific Motors, Inc., Joseph Walsh Hanley, Katherine S. Hanley, Midpac Auto Center, Inc., defendants.

Peter W. Olson, Cades Schutte Fleming & Wright, Honolulu, HI, Jonathan D. Hollister, Leslie C. Maharaj, Michael L. Freed & Associates, Honolulu, HI, for Clarendon National Insurance Company, CIM Insurance Corporation, defendants.

*ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING DEFENDANT CLARENDON'S MOTION FOR SUMMARY JUDGMENT*

DAVID ALAN EZRA, Chief Judge.

The court heard the parties Motions on July 13, 2000. Peter W. Olson, Esq., and Kaiulani Kidani, Esq., appeared at the hearing on behalf of CIM Insurance Corporation ("CIM"); David W. Proudfoot, Esq., appeared at the hearing on behalf of Midpac Auto Center, Inc. ("Midpac"), Inter Pacific Motors, Inc., d.b.a. Orchid Isle Auto Center ("Orchid Isle"), Joseph Walsh Hanley, and Katherine S. Hanley (collectively "the Hanley Defendants"); Michael L. Freed, Esq., appeared at the hearing on behalf of Clarendon National Insurance Company ("Clarendon"). After reviewing the motions and the supporting and opposing memoranda, the court GRANTS Plaintiff CIM's Motion for Summary Judgment ("Motion for Partial Summary Judg-

ment")[1] and GRANTS Defendant Clarendon's Motion for Summary Judgment.

## BACKGROUND

This is an insurance coverage dispute centered on whether the Hanley Defendants are entitled to defense and indemnity by CIM and/or Clarendon regarding allegations raised in *Patrick A. Fitzgerald, et al. v. [Hanley Defendants] et al.*, Civ. No. 99–0001, Fifth Circuit Court, State of Hawaii ("Fitzgerald Action," "underlying action," or "underlying dispute").

## A. THE UNDERLYING DISPUTE

The underlying dispute involves an action against Hanley Defendants by their former business associate Patrick Fitzgerald and his wife, Susan Fitzgerald (collectively "the Fitzgeralds").

Joseph and Katherine Hanley (collectively "the Hanleys"), husband and wife, owned and served as officers, directors, and shareholders of Defendant Orchid Isle, a car dealership in Hilo, Hawaii.[2]

Around November 1996, Patrick Fitzgerald entered into a Stockholders Agreement with the Hanleys, whereby the parties agreed to purchase the assets of Garden Isle Motors, Inc. ("Garden Isle"), in Lihue, Kauai. The Hanleys and Patrick Fitzgerald acquired Garden Isle through Inter Pacific Advertising, Inc. After acquiring the stock of Garden Isle, Inter Pacific Advertising, Inc. changed its name to Midpac.[3] At all times material to the underlying dispute, the Hanleys and Patrick Fitzgerald collectively served as Defendant Midpac's officers and directors, each owning 36.5 percent, 36.5 percent, and 27 percent of Midpac's common voting shares, respectively.

The Fitzgeralds allege that in March of 1997, the Hanleys induced Patrick Fitzgerald to leave his employment with Orchid Isle to become General Manager of Midpac. The Fitzgeralds also allege that the Hanleys induced them to invest $180,000 in the acquisition and funding of Midpac's start-up operations. In addition, the Fitzgeralds personally guaranteed certain business loans made to Midpac.

Pursuant to the Stockholders Agreement, Patrick Fitzgerald became the General Manager of Midpac at a salary of $5,000 per month, plus bonuses and an option to purchase the shares in the company held by the Hanleys. The Stockholders Agreement provided that Patrick Fitzgerald could not be terminated as General Manager except for "good cause." In March 1997, Midpac became a retail dealer for Ford Motor Company pursuant to a Ford Sales and Service Agreement dated March 3, 1997.

The Fitzgeralds claim that from the inception of these various agreements, the Hanleys managed the corporate and financial affairs of Midpac to the detriment of the Fitzgeralds. The Hanleys allegedly ignored the management advice of Patrick Fitzgerald, causing Midpac to suffer cash flow problems by late 1998. The Hanleys are also alleged to have improperly used their control of Midpac to increase the profits of Orchid Isle. The Fitzgeralds claim that the interference, mismanagement, and self-dealing by the Hanleys eventually caused Midpac's bank loans to go into arrears.

---

1. Plaintiff CIM filed a "Motion for Summary Judgment" but renamed it a "Motion for Partial Summary Judgment," stating that "CIM's motion is styled as a motion for summary judgment, however, it is probably more accurately described as a motion for partial summary judgment." (Plaintiff's Reply to [Hanley Defendants'] Memorandum in Opposition to Plaintiff's Motion for Summary Judgment, at 3 note 1).

2. Inter Pacific Motors, Inc., d.b.a. Orchid Isle Auto Center, is a Hawaii corporation with its main office and principal place of business in Hilo, Hawaii.

3. Midpac Auto Center, Inc., is a Hawaii Corp with its main office and principal place of business in Lihue, Hawaii.

On November 5, 1998, the Hanleys allegedly informed Patrick Fitzgerald that he was being terminated as President and General Manager of Midpac, and that they were exercising their right to purchase the Fitzgeralds' stock in Midpac at its book value. The Fitzgeralds claim that Patrick Fitzgerald's termination was done in violation of both Midpac's By–Laws and the Shareholders Agreement. They also allege that the Hanleys exerted unconscionable pressure on Patrick Fitzgerald in an effort to cause him to relinquish his contractual and legal rights, and to dilute Patrick Fitzgerald's ownership interest in Midpac.

## B. INSURANCE COVERAGES/PROCEDURAL HISTORY

Defendants Orchid Isle and Midpac were and/or are covered under insurance policies issued by CIM and Clarendon. The issue in the instant motion is whether CIM or Clarendon, or both, are obligated to defend and indemnify Hanley Defendants against the Fitzgeralds' claims under the terms of their relevant coverage forms. The relevant coverages and coverage periods are as follows:

Clarendon insured Orchid Isle from October 1, 1995 through October 1, 1997 under a policy that included coverage for Garage, Broadened Garage, Commercial General Liability ("CGL"), Commercial Excess Liability Insurance ("CELI"), Employment Practices Liability ("EPL"), Commercial Auto, and Employee Benefits Program Liability ("Clarendon's policy").[4] Prior to the expiration of the Clarendon policy on October 1, 1997, the Hanley Defendants allege that they were contacted by Cavanah Associates, Inc. ("Cavanah"), and asked to consider purchasing liability insurance from CIM through Cavanah.[5] The Hanley Defendants state that Joseph Hanley informed Cavanah that Cavanah would have to provide coverage identical to their Clarendon policy, to which Cavanah agreed and quoted a price lower than the premium they were paying under their Clarendon policy. The Hanley Defendants allege that they accepted the offer from Cavanah.

Accordingly, CIM began insuring Midpac[6] on February 28, 1997 and Orchid Isle[7] on October 1, 1997, and continues to insure both to the present. Both policies include Garage, Broadened Garage, CGL, Commercial Property, Commercial Crime, Special Classes, and Inland Marine Coverage ("CIM's policy"). After October 1, 1999, CIM added EPL coverage[8] to Orchid Isle's policy.[9]

On January 4, 1999, the Fitzgeralds filed their action against the Hanley Defendants and the accounting firm of Dolan, Silva & Associates ("Dolan"). The Complaint alleges sixteen causes of action against, inter alia, Walsh and Katherine Hanley, under the following counts: (I) Breach of Employment Contract; (II) Breach of Shareholders Agreement; (III) Wrongful Discharge; (IV) Tortious Breach of Contract; (V) Breach of Implied Covenant of Good

---

4. Policy No. CLR 000201287.

5. In or about September 1990, CIM entered into an agency agreement with PDP Group, Inc. ("PDP"), pursuant to which PDP was appointed CIM's general agent for all policies, certificates, and binders of insurance marketed and sold by CIM under its Preferred Dealer Protection Program ("the PDP Program"). Pursuant to this agreement, PDP was authorized to retain and appoint independent agents to market the PDP Program. In or about August 1997, PDP entered into a Producer Selling Agreement with Cavanah, pursuant to which Cavanah acted as an independent agent and was authorized only to offer and bind coverages, exposures, and premiums quoted by PDP on behalf of CIM.

6. Commercial Package Policy No. CPK0000192.

7. Commercial Package Policy No. CPK0000201.

8. On November 1, 1998, CIM became authorized in the State of Hawaii to offer or provide EPL coverage.

9. The relevant sections of the various policies are included as Attachment 1 to this Order.

Faith and Fair Dealing; (VI) Fraud and Deceit; (VII) Intentional Misrepresentation; (VIII) Reckless Misrepresentation; (IX) Negligent Misrepresentation; (X) Breach of Fiduciary Duty; (XI) Unjust Enrichment; (XII) Constructive Trusts; (XIII) Rescission; (XIV) Injunctive Relief; (XVI) Punitive Damages; and (XVII) Involuntary Dissolution.

After the Complaint was filed, Hanley Defendants tendered the underlying lawsuit to CIM for defense and indemnification. On January 13, 1999, CIM informed Hanley Defendants that it did not cover the claims asserted in the underlying action. In response to a letter from Hanley Defendants, on June 29, 1999, CIM agreed to defend Hanley Defendants in the underlying action subject to a full reservation of rights, which included the right to seek reimbursement of any attorney's fees and costs paid in defense of the underlying action if it is determined that there is no coverage.

On July 19, 1999, CIM filed its Complaint, which it amended on November 30, 1999, alleging four counts: that it (I) has no duty to defend; (II) has no duty to indemnify; (III) is entitled to attorney fees and costs; and (IV) is entitled to contribution by Defendant Clarendon. Hanley Defendants filed their Answer and Counterclaim on October 13, 1999, to which CIM replied on November 1, 1999. Hanley Defendants filed their Answer to the First Amended Complaint on December 21, 1999.

On March 3, 2000, Defendant Clarendon filed its Motion for Summary Judgment. CIM filed its Memorandum in Opposition to Clarendon's Motion for Summary Judgment on May 18, 2000, to which Defendant Clarendon replied on May 24, 2000. Hanley Defendants filed their Memorandum in Opposition to Defendant Clarendon's Motion for Summary Judgment on June 5, 2000.

On April 28, 2000, CIM filed its Motion for Partial Summary Judgment, asking for summary judgment on Counts I and II (no duty to defend or indemnify, respectively) of its First Amended Complaint. Hanley Defendants filed their Memorandum in Opposition to CIM's Motion for Summary Judgment on May 18, 2000, to which CIM replied on May 25, 2000.

## STANDARD OF REVIEW

Rule 56(c) provides that summary judgment shall be entered when:

> [T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). The moving party has the initial burden of demonstrating for the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (*citing Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). However, the moving party need not produce evidence negating the existence of an element for which the opposing party will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. 2548.

Once the movant has met its burden, the opposing party has the affirmative burden of coming forward with specific facts evidencing a need for trial. Fed.R.Civ.P. 56(e). The opposing party cannot stand on its pleadings, nor simply assert that it will be able to discredit the movant's evidence at trial. *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987); Fed.R.Civ.P. 56(e). There is no genuine issue of fact where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation omitted).

A material fact is one that may affect the decision, so that the finding of that fact is relevant and necessary to the proceedings. *Anderson v. Liberty Lobby, Inc.,*

477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue is shown to exist if sufficient evidence is presented such that a reasonable fact finder could decide the question in favor of the nonmoving party. *Id.* The evidence submitted by the nonmovant, in opposition to a motion for summary judgment, "is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255, 106 S.Ct. 2505. In ruling on a motion for summary judgment, the court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law. *Id.* at 254, 106 S.Ct. 2505. The court must assess the adequacy of the nonmovant's response and must determine whether the showing the nonmovant asserts it will make at trial would be sufficient to carry its burden of proof. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

At the summary judgment stage, this court may not make credibility determinations or weigh conflicting evidence. *Musick v. Burke,* 913 F.2d 1390, 1394 (9th Cir.1990). The standard for determining a motion for summary judgment is the same standard used to determine a motion for directed verdict: does the evidence present a sufficient disagreement to require submission to a jury or is it so one-sided that one party must prevail as a matter of law. *Id.* (citation omitted).

## DISCUSSION

The question before the court is whether the pleadings in the underlying action allege any claims that present the potential that Hanley Defendants are covered by either CIM's or Clarendon's insurance policy.

## A. INTRODUCTION

An insurance company's duty to defend "is limited to situations where the pleadings have alleged claims for relief which fall within the terms for coverage of the insurance contract. 'Where pleadings fail to allege any basis for recovery within the coverage clause, the insurer has no obli-

gation to defend.'" *Hawaiian Holiday Macadamia Nut Co., Inc. v. Indus. Indem. Co.,* 76 Hawai'i 166, 169, 872 P.2d 230 (1994). However, the duty to defend is not contingent upon liability as determined by the outcome of trial, but depends on the potential for coverage at the time suit is brought. *Commerce & Indus. Ins. Co. v. Bank of Hawaii,* 73 Haw. 322, 327, 832 P.2d 733 (1992), *recon. denied,* 73 Haw. 625, 834 P.2d 1315 (1992). "Furthermore, where a suit raises a potential for indemnification liability of the insurer to the insured, the insurer has a duty to accept the defense of the entire suit even though other claims of the complaint fall outside the policy's coverage." *Commerce & Indus. Ins. Co.,* 73 Haw. at 326, 832 P.2d 733 (quoting *First Ins. Co. of Hawaii v. State,* 66 Haw. 413, 417, 665 P.2d 648 (1983)).

■ It is undisputed that an insurer's duties to its insured are contractual in nature and thus the court must look to the language of the policy to determine the scope of such duties. *Sentinel Ins. Co., Ltd. v. First Ins. Co. of Hawai'i, Ltd.,* 76 Hawai'i 277, 875 P.2d 894 (1994). *See also First Ins. Co. of Hawaii, Inc.,* 66 Haw. at 423–24, 665 P.2d 648 (1983) (stating that "[insurance] policies are subject to the general rules of contract construction; the terms of the policy should be interpreted according to their plain, ordinary, and accepted sense in common speech unless it appears from the policy that a different meaning is intended"). "Nevertheless, adherence to the plain language and literal meaning of insurance contract provisions is not without limitation. 'Because insurance policies are contracts of adhesion and are premised on standard forms prepared by the insurer's attorneys, [courts] have long subscribed to the principle that they must be construed liberally in favor of the insured and [any] ambiguities [must be] resolved against the insurer.'" *Dairy Road Partners v. Island Ins. Co., Ltd.,* 92 Hawai'i 398, 411, 992 P.2d 93 (2000) (citing *Sturla, Inc. v. Fireman's Fund Ins. Co.,* 67 Haw. 203, 209, 684 P.2d 960 (1984))

(citations and internal quotation marks omitted); *Trizec Properties, Inc. v. Biltmore Constr. Co.*, 767 F.2d 810, 812 (11th Cir.1985) (stating that "[a]ll doubts as to whether a duty to defend exists are resolved against the insurer and in favor of the insured").

■ Furthermore, basic Hawaii insurance law provides that "the obligation to defend ... is broader than the duty to pay claims and arises wherever there is the mere potential for coverage." *Commerce & Indus. Ins. Co.*, 73 Haw. at 326, 832 P.2d 733. "In other words, the duty to defend 'rests primarily on the possibility that coverage exists. This possibility may be remote but if it exists[,] the [insurer] owes the insured a defense.'" *Dairy Road Partners*, 92 Hawai'i at 412, 992 P.2d 93 (citing *Standard Oil Co. of California v. Hawaiian Ins. & Guar. Co., Ltd.*, 65 Haw. 521, 527, 654 P.2d 1345 (1982)). "Thus, an insurance company has an obligation to investigate to determine whether a third party's action raises a potential for coverage and thus implicates its duty to defend when '(1) the allegations in the pleadings should alert the insurer that there is a potential for coverage ...; (2) the allegations differ from facts the insurer knows or can readily determine; or (3) the allegations are ambiguous.'" *Allstate Ins. Co. v. Hui*, 57 F.Supp.2d 1039, 1043 (D.Haw., 1999) (quoting *Bayudan v. Tradewind Ins. Co.*, 87 Hawai'i 379, 380, 957 P.2d 1061 (1998)).

## B. CIM'S POLICIES

■ To determine whether the underlying claims are covered by CIM's policy, we look first to the language of the policy. The language of the Broadened Garage Coverage states that "[CIM] will pay all sums the 'insured' legally must pay as damages because of: a. 'Personal injury [sic] caused by an offense committed: (1) In the conduct of your business[.]'" The Amended Liability Coverage Endorsement expanded the definition of "[p]ersonal injury" from "bodily injury" or "property damage" "to include: Injury from mental anguish or injury; shock or humiliation. It also means injury arising out of [six enumerated torts]".[10] CIM argues that this definition is narrow and limited to the six enumerated torts, which do not apply to any of the alleged claims. CIM's reading of the definition is misplaced. The terms "include" and "also means" are terms of expansion and indicate that the definition of personal injury is not necessarily confined to the listed torts, and could potentially cover the allegations set forth in the Fitzgerald Complaint, despite the fact that there is an absence of bodily injury or property damage.[11] Had CIM intended its policy to cover only the six enumerated torts, it should and could have used "is limited to" instead of the word "includes."

On the other hand, the policy states, in numerous sections, that the insurance policy does not apply to liability assumed under any contract or agreement.[12] Consis-

---

**10.** The six torts are (1) arrest, detention or imprisonment; (2) malicious prosecution; (3) wrongful entry into, or eviction of a person from, a room, dwelling or premises that the person occupies; (4) oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; (5) oral or written publication of material that violates a person's right of privacy; or (6) discrimination.

**11.** The parties also raise the issue of exclusion of certain employer liabilities under the Garage Coverage Form. The Form states that the insurance does not apply to " 'Bodily injury'

to: a. An employee of the 'insured' arising out of and in the course of employment by the 'insured'[.]" As Patrick Fitzgerald was both an employee and a shareholder, this exclusion may not apply in all instances. Furthermore, Susan Fitzgerald is not an employee and thus this exclusion does not apply to her claims. Thus, the possibility exists that covered claims might potentially be raised by Susan Fitzgerald and by Patrick Fitzgerald in his capacity as a shareholder.

**12.** The exclusion section of the Garage Coverage form states that "[t]his insurance does not apply to any of the following: ... [l]iability assumed under any contract or agreement."

tent with this language, courts have held that any claim that is dependent upon the existence of an underlying contract is not covered by insurance policies. *WDC Venture v. Hartford Accident and Indem. Co.*, 938 F.Supp. 671, 678 (1996) (citing *Stanford Ranch v. Maryland Cas. Co.*, 89 F.3d 618, 625–26 (9th Cir.1996)). This includes "contract-like" tort claims. *CIM Ins. Corp. v. Masamitsu*, 74 F.Supp.2d 975, 986 (D.Haw., 1999). Conversely, the insurance policy states that it does apply to liability for damages that the insured would have in the absence of the contract or agreement.[13] However, the policy states that it does not apply to intentional acts on the part of the insured.[14]

The question is whether any of the allegations in the underlying action conform to the language of CIM's insurance policy.

### 1. THE FITZGERALD CLAIMS

CIM argues that all the claims in the underlying action arise out of a contract or agreement between the parties, and thus are not covered by the policy. Hanley Defendants argue that at least three counts—three, five, and ten—raise the possibility of claims not dependant on any contract or agreement, entitling them to defense and indemnity.

Analyzing each count in turn:

a. Count One, breach of employment contract against the Hanleys and Midpac, alleges that "[t]he ouster of [Patrick Fitzgerald] ... constitutes a material breach of his employment agreement contained within said 'Shareholders Agreement'".[15] Count One thus arises out of an agreement and is not covered by the policy.

b. Count Two, breach of shareholders agreement against the Hanleys, alleges that the "interference, mismanagement, and self-dealing by [the Hanleys] and the ouster of [Patrick Fitzgerald] as President and General Manager and Operator of MIDPAC ... constitute a material breach of said 'Shareholders Agreement' but for which he has been and remains willing and able to perform his obligations thereunder." The alleged breach is dependant on an underlying agreement and is thus not covered by the policy.

■ c. Count Three, wrongful discharge against the Hanleys and Midpac, alleges that the ouster of Patrick Fitzgerald "constitutes a wrongful discharge pursuant to his employment agreement contained within said 'Shareholders Agreement,' in furtherance of a fraud perpetrated upon [the Fitzgeralds] ...." Hanley Defendants claim that this count is not limited to allegations that they acted in violation of the Shareholders Agreement but raises the possibility of other claims not based in any agreement or contract. They cite paragraphs 19 [16] and 20 [17] of the Fitzgerald Complaint in

---

The exclusion section of the Broadened Garage Coverage form states that "[t]his insurance does not apply to [l]iability assumed under any contract or agreement. But this exclusion does not apply to liability for damages that the 'insured' would have in the absence of the contracts or agreement."

**13.** *See supra* text accompanying note 12.

**14.** *See* exclusions section of CIM's Standard Garage Coverage Form.

**15.** In addition, Shareholders Agreements are enforced under traditional principles of contract law. *Concord Auto Auction, Inc. v. Rustin*, 627 F.Supp. 1526 (D.Mass., 1986); *Blank v. Chelmsford Ob/Gyn, P.C.*, 420 Mass. 404, 406, 649 N.E.2d 1102 (1995).

**16.** Paragraph 19 of the Fitzgerald Complaint states that "in an attempt to cover up the disastrous results of their interference, mismanagement, and self-dealing aforesaid, and to take advantage of the slow profit realization of MIDPAC which they themselves were responsible for, [the Hanleys] abruptly informed [Patrick Fitzgerald] by letter that they were terminating him without citing any grounds for just cause...."

**17.** Paragraph 20 of the Fitzgerald Complaint states that "termination of [Patrick Fitzgerald] was attempted, further, in complete violation of the 'By-Laws' of MIDPAC requiring a noticed meeting of shareholders for such purposes...."

conjunction with Count Five as proof that at least the mere possibility of other claims might be raised.

■ Regarding paragraph 19, the Hanley Defendants contend that the paragraph raises potential claims based on interference, mismanagement, and self-dealing which could be brought outside the existence of any contract or agreement. These types of claims are generally brought as shareholder derivative suits. However, an insurer has no duty to defend where the pleadings fail to raise covered claims. *Hawaiian Holiday Macadamia Nut Co., Inc.*, 76 Hawai'i at 169, 872 P.2d 230. Here, the Fitzgerald Complaint does not indicate that a derivative suit was filed or even contemplated. Accordingly, CIM has no duty to defend or indemnify based on this alleged theory.

Regarding paragraph 20, the issue is whether a breach of Midpac's By–Laws, requiring a shareholders meeting prior to Patrick Fitzgerald's termination, is a claim arising out of a contract or agreement. Since the By–Laws, together with the Articles of Incorporation, are an integral part of the Shareholders Agreement, this claim necessarily arises out of an agreement. Furthermore, the alleged breach of the By–Laws is premised on and arises out of the alleged breach of Patrick Fitzgerald's employment agreement. Accordingly, CIM has no duty to defend or indemnify here.

d. Count Four, tortious breach of contract against the Hanleys and Midpac, alleges that the "interference, mismanagement, and self-dealing by [the Hanleys] and the ouster of [Patrick Fitzgerald] as President and General Manager and Operator of MIDPAC ... constitute an intentional, tortious breach of said 'Shareholders Agreement,' and its underlying employment agreement, entitling [Patrick Fitzgerald] to an award of both actual and punitive damages...." Because the "tor-

tious breach" would not exist without the contract, the claim is not covered.[18]

■ e. Count Five, breach of implied covenant of good faith and fair dealing against the Hanleys, alleges that the "interference, mismanagement, and self-dealing by [the Hanleys] and the ouster of [Patrick Fitzgerald] as President and General Manager and Operator of MIDPAC ... constitute an intentional, tortious breach of said 'Shareholders Agreement,' and its underlying employment agreement, entitling [Patrick Fitzgerald] to an award of both actual and punitive damages, as requested aforesaid." Shareholder agreements are enforced under traditional principles of contract law, which include general requirements of good faith and fair dealing. Restatement (Second) Contracts § 205 (1979) provides that "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." In *Hawaii Leasing v. Klein*, 5 Haw.App. 450, 456, 698 P.2d 309 (1985), the Intermediate Court of Appeals explicitly recognized that parties to a contract have a duty of good faith and fair dealing in performing contractual obligations. *See* HRS § 490:1–203 (1993) (providing that "[e]very contract or duty within this chapter imposes an obligation of good faith in its performance or enforcement."). *See also Brassil v. Maryland Cas. Co.*, 210 N.Y. 235, 104 N.E. 622 (1914). Therefore, this breach cannot exist outside the Shareholders Agreement and the claim is excluded by the policy. In addition, this claim alleges an intentional act, which is expressly not covered under CIM'S policy.

f. Count Six, fraud and deceit against the Hanleys, alleges that "[Patrick Fitzgerald] was induced by the fraudulent misrepresentations of [the Hanleys], upon which he reasonably relied ... to enter into said 'Shareholders Agreement,' when

---

**18.** Although this claim is a tort-based claim, it is still based in a contract, and is not covered.

*WDC Venture,* 938 F.Supp. at 679.

in fact, then and there, at the time of signing same, neither [the Hanleys], nor the both of them, intended to carry out their promises therein to [Patrick Fitzgerald], as a result of which he suffered and continues to suffer the actual damages...." Again, this claim is dependent on the existence of the Shareholders Agreement and is not covered.

g. Counts Seven, Eight, and Nine, intentional, reckless, and negligent misrepresentation against the Hanleys, allege that Patrick Fitzgerald "was induced by" the intentional, reckless, and negligent misrepresentations, respectively, of the Hanleys, "upon which he reasonably relied ... to enter into said 'Shareholders Agreement,' when in fact, then and there, at the time of signing same, neither [Walsh nor Katherine Hanley] intended to carry out their promises therein to [Patrick Fitzgerald], as a result of which he suffered and continues to suffer the actual damages...." Again, these claims arise out of the Shareholders Agreement and are not covered. Furthermore, see *CIM Ins. Corp.*, 74 F.Supp.2d at 986–87 (finding that the negligent misrepresentation claim stemmed from intentional acts or contract-based claims).

■ h. Count Ten, breach of fiduciary duty against the Hanleys, alleges that "[t]he relationship between [the Fitzgeralds] and [the Hanleys] was a fiduciary relationship as [the Hanleys] were and are the controlling persons of MIDPAC, such that [the Hanleys] had fiduciary duties to [Patrick Fitzgerald] as MIDPAC's President and General Manager and minority shareholder and to [Susan Fitzgerald] as a loan guarantor of MIDPAC for the benefit of [the Hanleys], based upon the trust and confidence [the Fitzgeralds], in reliance thereon, had in them, to act in a fair and reasonable manner toward them, which relationship was breached by the acts above complained of, entitling [the Fitzgeralds] each to the actual damages above claimed and also to the punitive damages above claimed." Hanley Defendants argue that

"this cause of action is not based on any contract but, on a legal obligation imposed by law." Regardless, these claims are premised on the contractual relationship between the Fitzgeralds and the Hanleys and arise out of the Shareholders Agreement. CIM owes no duty to defend and indemnify Hanley Defendants on this alleged claim.

■ i. Counts Eleven, Twelve, Thirteen, and Fourteen allege unjust enrichment and demand constructive trusts, rescission, and injunctive relief, respectively, against, inter alia, the Hanleys. Liability policies provide coverage for damages owed by the insured. Therefore, equitable claims for restitution or disgorgement are not covered. 2 A. Windt, *Insurance Claims and Disputes* § 11.06 (3d ed.1995). Furthermore, these claims are dependant on the existence of a contract or agreement. Accordingly, these claims are not covered by CIM's policy.

j. Count Sixteen demands punitive damages from the Hanleys. Hawaii Revised Statutes § 431:10–240 states that no insurance policy shall be construed to provide coverage for punitive or exemplary damages unless such coverage is specifically included in the Policy. CIM's policies do not provide coverage for punitive or exemplary damages. Therefore, this claim does not invoke a duty to defend or indemnify.

2. POSSIBILITY OF CLAIM BASED ON MENTAL ANGUISH OR INJURY, OR SHOCK OR HUMILIATION.

■ The Broadened Garage Coverage form expands the definition of "personal injury" to "include: Injury from mental anguish or injury; shock or humiliation." The Hanley Defendants argue that the Fitzgerald Complaint contains a number of allegations that could form the basis of a claim based on mental anguish or injury; shock or humiliation. They cite, for example, paragraph 14 which alleges that the

Hanleys "coerced [Patrick Fitzgerald]";[19] paragraph 17 which alleges that Patrick Fitzgerald was "hindered and rendered incapable of performing";[20] paragraph 18 which alleges that the Fitzgeralds were "unexpectedly subject to serious financial exposure";[21] paragraph 22 which alleges that Patrick Fitzgerald was placed under "unconscionable pressure";[22] and paragraph 44, Count Sixteen, which alleges that the Hanleys acted in "reckless disregard for the rights and feelings" of the Fitzgeralds.[23] Careful examination of these allegations reveals that they are all premised on the existence of a contractual relationship between the Hanleys and Patrick Fitzgerald. Thus, CIM owes no duty to defend or indemnify on this alleged underlying claim.

### 3. UNPLED CLAIM FOR DEFAMATION

The Hawai'i Supreme Court has stated, "[t]he well established general rule is that the allegations in the complaint in the underlying action determine an insurer's duty to defend its insured." *AIG Hawaii Ins. Co. v. Smith*, 78 Hawai'i 174, 178, 891 P.2d 261 (1995). Moreover, "the duty to defend is limited to situations where the pleadings have alleged claims for relief which fall within the terms of coverage of the insurance contract [and] 'where pleadings fail to allege any basis for recovery within the coverage clause, the insurer has no obligation to defend.'" *Hawaiian Holiday Macadamia Nut Co., Inc.*, 76 Hawai'i at 169, 872 P.2d 230 (1994) (quoting *Hawaiian Ins. Guar. Co. v. Blair, Ltd.*, 6 Haw.App. 447, 449, 726 P.2d 1310 (1986)). Hanley Defendants fail to raise a defamation claim in their pleadings. Instead, Hanley Defendants point to a statement made by Fitzgeralds' attorney, Mr. Dubin, to Hanley Defendants in which Mr. Dubin states, "[t]he Fitzgeralds, for example, are less than amused by the now documented defamatory comments the Hanleys have been making about Mr. Fitzgerald, at least before the lawsuit was filed ...," as the basis for a potential claim. This statement neither amounts to a pled claim nor the merest possibility of a pled

---

19. Paragraph 14 of the Fitzgerald Complaint states in full, "[Hanleys] ... further coerced [Patrick] into agreeing to retain [Walsh] as a consultant to MIDPAC for the monthly amount of $1,200 plus additional profit participation, for which [Walsh] did no work for MIDPAC whatsoever, further weakening [Midpac's] finances, to the detriment of [the Fitzgeralds] and their investment in MIDPAC."

20. Paragraph 17 of the Fitzgerald Complaint states in full, "[a]s a result of said interference, mismanagement, and self-dealing aforesaid by [the Hanleys], [Patrick Fitzgerald] was hindered and rendered incapable of performing pursuant to his rights and responsibilities under said 'Shareholders Agreement' and its underlying employment agreement which appointed him as MIDPAC's 'Operator,' through no fault of [Patrick Fitzgerald]."

21. Paragraph 18 of the Fitzgerald Complaint states in full, "[a]s a result of said interference, mismanagement, and self-dealing aforesaid by [Hanleys], by late 1998 the principal amounts of MIDPAC's loans with First Hawaiian Bank remained substantially unpaid and [the Fitzgeralds] as guarantors of said loans remained therefore unexpectedly subject to serious financial exposure."

22. Paragraph 22 of the Fitzgerald Complaint states in full, "[s]ubsequent to said wrongful ouster of [Patrick] as President and General Manager of MIDPAC by [the Hanleys], the financial condition of MIDPAC has been allowed by [the Hanleys] to deteriorate in order to place unconscionable pressure upon [Patrick] to relinquish his legal and contractual rights set forth below, and in order to serve as an excuse for [the Hanleys] to invest further sums in MIDPAC for the sole purpose of diluting [Patrick's] stock ownership interest therein, all to [the Fitzgerald's] detriment."

23. Paragraph 44 of the Fitzgerald Complaint states in full, "[t]he acts of fraud, misrepresentation, interference, mismanagement, self-dealing, wrongful discharge, and tortious breach of contract, as explained above, done with a wanton, callous, intentional and/or reckless disregard for the rights and feelings and financial health of [the Fitzgeralds], entitle [the Fitzgeralds] to an award of exemplary and punitive damages as above claimed."

claim.[24]  Hanley Defendants cannot raise this claim post-pleadings in hopes of invoking insurance coverage.

### 4. CAVANAH & ASSOCIATES: CLAIM FOR WRONGFUL TERMINATION

Hanley Defendants argue that a genuine issue of material fact exists as to the agency of Cavanah and the representations made by them.  Specifically, Hanley Defendants allege that Cavanah, acting as an agent of CIM, misrepresented the scope of the insurance policy Hanley Defendants purchased from them to include EPL.  Hanley Defendants allege that, if covered by EPL, the Fitzgeralds' claim of wrongful termination triggers potential coverage.  CIM argues that Hanley Defendants are precluded from raising the allegation because (1) Hanley Defendants failed to read the policy and discover the mistake, or (2) independent agents are deemed the agents of the policy holder, not the insurer.

The preliminary issue is whether EPL might insure against the Fitzgeralds' wrongful termination claim.  CIM's EPL provides coverage for "those sums an 'insured' legally must pay as 'damages' because of 'wrongful employment practices' to which this insurance applies."  The EPL form defines "wrongful employment practice" as "termination of an employment relationship in a manner which is against the law, or in breach of an *implied* agreement to continue employment[ ]"

(emphasis added).  Accordingly, the exclusion section of the EPL policy states that, "[t]he insurance provided by [EPL] does not apply to: G. 'damages' arising out of the breach of an *express* written or oral contract of employment or an express obligation to pay monies, including bonuses, in the event of termination of employment[ ]" (emphasis added).  Since Patrick Fitzgerald's allegations of wrongful termination arise out of his employment agreement, and the employment agreement is an express written agreement contained within the Shareholders Agreement, CIM's EPL coverage would not apply to the wrongful termination claim.  Hence, it is not necessary for the court to address the agency issue to determine whether the EPL coverage actually exists.

Because the Fitzgerald Action fails to allege any claims, or potential claims, which are covered under CIM's policy, the Hanley Defendants are not entitled to defense and indemnity by CIM. Partial summary judgment is accordingly GRANTED.

### C. DEFENDANT CLARENDON'S POLICIES

Hanley Defendants also contend that they are entitled to defense and indemnity by Clarendon on claims alleged in the underlying lawsuit.  Specifically, they claim that the Clarendon policy[25] insured them against the Fitzgerald claims of negligent misrepresentation in addition to other pos-

---

24. Note that in *Standard Oil Co. of California v. Hawaiian Ins. & Guar. Co., Ltd.,* 65 Haw. 521, 654 P.2d 1345 (1982) the court stated that an insurer "must look beyond the effect of the pleadings and must consider any facts brought to its attention or any facts which it reasonably discovers in determining whether it has a duty to defend...." However, the Hawaii Supreme Court refined the rule to mean that "where the insured tendered his or her defense in a lawsuit in which the complaint does not clearly and unambiguously assert a covered claim, the insurer, as a precondition to refusing the tender on the ground that there is no possibility of coverage, must nevertheless conduct a reasonable investigation to ensure that the facts of the case not obligate it to defend the insured."

*Dairy Road Partners v. Island Ins. Co., Ltd.,* 92 Hawai'i 398, 992 P.2d 93 (2000). Here, the issue of whether the defamation claim is asserted "clearly" and "unambiguously" is moot as the claim is not asserted at all.

25. According to the Opposition to Clarendon's Motion for Summary Judgment, Hanley Defendants argue that Clarendon is obligated to indemnify Hanley Defendants under its Garage, Broadened Garage, CGL, and/or CELI coverage.  It is undisputed that Clarendon Defendant's Commercial Auto Coverage, Employee Benefits Program Liability Coverage, and Pollution Liability Coverage forms do not provide coverage.

sible claims that might be pled in the underlying action.

Clarendon argues that the Hanley Defendants do not qualify for coverage on any of the alleged claims. The court agrees.

### 1. NEGLIGENT MISREPRESENTATION CLAIM; OTHER POSSIBLE CLAIMS: CGL and CELI COVERAGE

■ Clarendon insured Orchid Isle from October 1, 1995 to October 1, 1997. Approximately one year prior to the expiration of the policy, in November 1996, the Hanleys entered into a Stockholders Agreement with Patrick Fitzgerald to acquire the assets of Garden Isle through Midpac.

The Hanleys served as officers, directors, and shareholders of Orchid Isle during the coverage period. The Hanley Defendants argue that the Fitzgerald Complaint alleges claims against the Hanleys for actions, such as negligent misrepresentation, which occurred during Clarendon's coverage of Orchid Isle. Hanley Defendants base their claim that Clarendon owes them a duty to defend and indemnify on a reading of the policy that extends the policy's coverage to Midpac as a "newly acquired organization." The Hanley Defendants' reading of the policy is misplaced.

Throughout Clarendon's policy, the "NAMED INSURED" is listed as "INTER PACIFIC MOTORS, INC. DBA ORCHID ISLE AUTO CENTER." The CGL form states that "[t]hroughout this policy the words 'you' and 'your' refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy." The CELI, under the section "WHO IS AN INSURED," states that,

1. If **you** are designated in the Declarations as:
   a) An individual, **you** and **your** spouse are insured, but only with respect to the conduct of a business of which **you** are the sole owner.
   b) A partnership or joint venture, **you** are an insured. **Your** members, **your** partners, and **their** spouses are also insureds, but only with respect to the conduct of **your** business.
   c) An organization other than a partnership or joint venture, **you** are an insured.

Since Orchid Isle is neither an individual nor a partnership, but a corporation, (1)(c) applies, and "you" and "your" refer solely to Orchid Isle.

The CELI further provides that "[e]ach of the following is also an insured: ... c. Any organization **you** newly acquire or form, other than a partnership or joint venture, and over which **you** maintain ownership or majority interest, will be deemed to be a Named Insured." [26] However, Orchid Isle did not acquire Garden Isle (Midpac). The Hanleys, acting on their own and with Patrick Fitzgerald, acquired Midpac. Orchid Isle is mentioned nowhere in Midpac's Shareholders Agreement, Articles of Incorporation, or By-Laws. Indeed the Hanleys and Patrick Fitzgerald are the only names appearing on these documents.[27]

Furthermore, CIM insured Midpac beginning on February 28, 1997, approximately seven months prior to the expiration of Clarendon's policy. If Midpac was insured by Clarendon as Hanley Defendants contend, there would have been little reason to double-insure Midpac for seven months under CIM's policy.

Therefore, Clarendon insured only Orchid Isle for the period until October 1, 1997. The remaining issue is whether the

**26.** It is the CELI's list of insureds on which Hanley Defendants base their claim that Clarendon's coverage was extended to Midpac.

**27.** The name Gib Black also appears, once, in the Articles of Incorporation.

Fitzgerald Complaint alleges any causes of action against Orchid Isle during this time.

■ The Fitzgerald Complaint implicates Orchid Isle in the following ways:

- Paragraph 8: in March 1997 the Hanleys induced Patrick Fitzgerald into leaving his employment with Orchid Isle to become General Manager of Midpac and "eventually" investing $180,000 into Midpac.

- Paragraph 15: the Hanleys used their control of Midpac to increase the profits of Orchid Isle.

- In Hanley Defendants' Opposition to Clarendon's Motion for Summary Judgment, Hanley Defendants argue that Counts Five, Eight, Nine, and Ten allege that the Hanleys made negligent misrepresentations to Patrick Fitzgerald during the period leading up to the acquisition of Garden Isle (Midpac). During this time, the Hanleys owned Orchid Isle and Orchid Isle was insured by Clarendon.

- In Hanley Defendants' Opposition to Clarendon's Motion for Summary Judgment, Hanley Defendants argue that the Fitzgerald Complaint raises the possibility of claims that invoke Clarendon's duty to defend and indemnify.

None of the alleged claims, however, are against Orchid Isle. The alleged claims are against the Hanleys for their actions separate and distinct from their ownership of Orchid Isle; that is, the Hanleys were not acting on behalf of Orchid Isle in their dealings and negotiations with Patrick Fitzgerald. The only possible connection is the vague allegation that the Hanleys used their control of Midpac to increase the profits of Orchid Isle. This, however, still fails to implicate Orchid Isle as the Hanleys, acting solely on their own behalf, are the alleged wrong-doers. Clarendon owes no duty to defend and indemnify Hanley Defendants.

## 2. WRONGFUL TERMINATION CLAIM: EPL COVERAGE [28]

■ In addition to the reasons set forth in the previous section, EPL coverage does not apply because it is time-barred.

Clarendon's EPL coverage applies to:

negligent acts or omissions that are the result of 'employment-related practices' only if:

(1) The negligent acts or omissions are caused by an "occurrence" that takes place in the "coverage territory[sic]"; and

(2) The negligent acts or omissions did not occur before the Retroactive Date, if any, shown in the Declarations or after the end of the policy period; and

(3) A claim for damages because of the negligent acts or omissions is first made against the insured, in accordance with paragraph c. below, during the policy period or any Extended Reporting Period we provide under EXTENDED REPORTING PERIODS....

"Occurrence" is defined as any negligent act or omission which arises out of wrongful termination, harassment, humiliation, or mental anguish; and which is the result of "employment-related practices." "Employment-related practices" is defined as acts committed by an insured which are directly or indirectly related to the prospective employment, present employment or employment termination of any person by the insured. The coverage excludes intentionally committed negligent acts or omissions. Thus, the Fitzgerald claims are potentially covered by the EPL.

However, the claims for damages have not been timely filed within the "extended

---

**28.** Hanley Defendants do not appear to dispute that Clarendon does not owe a duty to indemnify under its EPL coverage.

reporting period." EPL's Basic Extended Reporting Period allows five years for claims arising out of an "occurrence." This "occurrence," however, must be reported to Clarendon within sixty days after the end of the policy period, therefore by December 1, 1997. Hanley Defendants produce no evidence of compliance with this provision. Therefore, none of the Fitzgerald claims invoke the duty to indemnify or defend under Clarendon's EPL coverage because they are time barred under the policy.

### 3. DEFAMATION CLAIM [29]

For the same reasons as set forth in sections (B)(3) and (C)(1), Clarendon does not owe a duty to defend and indemnify to Hanley Defendants.

### CONCLUSION

For the reasons stated above, the court GRANTS Plaintiff CIM's Motion for Partial Summary Judgment and GRANTS Defendant Clarendon's Motion for Summary Judgment.

IT IS SO ORDERED.

### ATTACHMENT 1

### A. CIM'S POLICY

### 1. STANDARD GARAGE COVERAGE FORM

The Standard Garage Coverage provides that,

> We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from "garage operations."

"Bodily injury," "property damage" and "accident" are defined in the Garage Coverage Form as follows:

**29.** Hanley Defendants do not appear to argue that Clarendon owes a duty to indemnify

> "Accident includes continuous or repeated exposure to the same conditions resulting in "bodily injury" or "property damage."

> . . .

> "Bodily injury" means bodily injury, sickness or disease sustained by a person including death resulting from any of these.

> "Garage operations" means the ownership, maintenance or use of locations for garage business and that portion of the roads or accesses that adjoin these locations. "Garage operations" includes the ownership, maintenance or use of the "autos" indicated in SECTION 1 of this Coverage Form as covered "autos." "Garage operations" also include all operations necessary or incidental to a garage business."

> . . .

> "Property damage" means damage to or loss of use of tangible property."

The exclusion section states that "[t]his insurance does not apply to ... [expected or intended injury] ... [or] Liability assumed under any contract or agreement...."

### 2. BROADENED GARAGE COVERAGE

The Broadened Garage Coverage provides that,

> [CIM] will pay all sums the 'insured' legally must pay as damages because of:
> a. "Personal injury caused by an offense committed:
>> (1) In the conduct of your business; and
>> (2) In the Coverage Territory during the Policy Period.
> b. "Advertising injury" caused by an offense committed:
>> (1) In the course of advertising your goods, products or services; and

based on this alleged claim.

(2) In the Coverage Territory during the Policy Period.

We have the right and duty to defend any "suit" asking for these damages. However, we have no duty to defend "suits" for "personal injury" or "advertising injury" not covered by this Coverage Form.

The exclusions section of this form states that:

This insurance does not apply to:

1. Liability assumed under any contract or agreement. But this exclusion does not apply to liability for damages that the "insured" would have in the absence of the contract or agreement. . . .

As used in the Broadened Garage Coverage, the term "personal injury" is defined as:

"Personal injury" means injury, other than "bodily injury," arising out of one or more of the following offenses:

1. False arrest, detention or imprisonment;

2. Malicious prosecution;

3. Wrongful entry into, or eviction of a person from, a room, dwelling or premises that the person occupies;

4. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

5. Oral or written publication of material that violates a person's right of privacy.

### 3. AMENDED LIABILITY COVERAGE ENDORSEMENT

CIM's broadened coverage was further expanded by the Amended Liability Coverage Endorsement to include mental anguish or injury, shock or humiliation within the definition of "personal injury." As the endorsement states:

The definition of "Personal Injury" is expanded to include: Injury from mental anguish or injury; shock or humiliation. It also means injury arising out of:

1. Arrest, detention or imprisonment;

2. Malicious prosecution;

3. Wrongful entry into, or eviction of a person from, a room, dwelling or premises that the person occupies;

4. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

5. Oral or written publication of material that violates a person's right of privacy; or

6. Discrimination.

As used in this form, discrimination means the act of differentiation based on age, race, color, sex, religion, national origin, physical handicap or sexual preference which violates any applicable federal, state or local statute which pertains to discrimination.

### 4. COMMERCIAL GENERAL LIABILITY

The section under who constitutes an insured provides that:

1. If you are designated in the Declarations as:

. . .

g. A partnership or joint venture, you are an insured. Your members, your partners and their spouses are also insureds, but only with respect to the conduct for your business.

h. An organization other than a partnership or joint venture, you are an insured. Your executive officers and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

5. EMPLOYMENT PRACTICES LIABILITY INSURANCE (EPL)

This coverage, added on October 1, 1999, provides that "[CIM] will pay those sums an 'insured' legally must pay as 'damages' because of 'wrongful employment practices' to which this insurance applies."

The exclusion section states that,

The insurance provided by this endorsement does not apply to:

. . .

B. an "insured" that intentionally committed the alleged "wrongful employment practice" . . .

C. an "insured" that commits a dishonest, criminal, or fraudulent act or omission, or willful or deliberate violation of any statute, regulation, rule, agreement, or judicial or regulatory order. . . .

. . .

G. "damages" arising out of the breach of an express written or oral contract of employment or an express obligation to pay monies, including bonuses, in the event of termination of employment;

. . .

K. "damages" arising out of the assumption of liability for a "wrongful employment practice" in a contract or agreement. This exclusion does not apply to liability for "damages" because of "wrongful employment practices" the "insured" would have had even in the absence of such contract or agreement;

. . .

J. "Wrongful employment practice" means:

. . .

11. Termination of an employment relationship in a manner which is against the law, or in breach of an implied agreement to continue employment;

B. DEFENDANT CLARENDON'S POLICY

1. STANDARD GARAGE COVERAGE FORM

The Standard Garage Coverage provides that,

[Clarendon] will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from "garage operations [sic] other than the ownership, maintenance or use of covered 'autos' ".

"Bodily injury," "property damage," "accident," and "garage operations" are defined in the Garage Coverage Form as follows:

"Accident [sic] includes continuous or repeated exposure to the same conditions resulting in 'bodily injury' or 'property damage.' "

. . .

"Bodily injury" means bodily injury, sickness or disease sustained by a person including death resulting from any of these.

"Garage operations" means the ownership, maintenance or use of locations for garage business and that portion of the roads or accesses that adjoin these locations. "Garage operations" includes the ownership, maintenance or use of the "autos" [sic] indicated in SECTION 1 of this Coverage Form as covered "autos." "Garage operations" also include all operations necessary or incidental to a garage business.

. . .

"Property damage" means damage to or loss of use of tangible property.

2. BROADENED GARAGE COVERAGE

The Broadened Garage Coverage provides that,

[Clarendon] will pay all sums the "insured" legally must pay as damages because of:

a. Personal injury [sic] caused by an offense committed:

(1) In the conduct of your business; and

(2) In the Coverage Territory during the Policy Period.

b. "Advertising injury" caused by an offense committed:

(1) In the course of advertising your goods, products or services; and

(2) In the Coverage Territory during the Policy Period.

We have the right and duty to defend any "suit" asking for these damages. However, we have no duty to defend "suits" for "personal injury" or "advertising injury" not covered by this Coverage Form.

The "exclusions" section of this coverage states that:

This insurance does not apply to:

3. Liability assumed under any contract or agreement. But this exclusion does not apply to liability for damages that the "insured" would have in the absence of the contract or agreement.

. . .

4. "Personal injury" to:

1. A person arising out of any:

(1) Refusal to employ that person;

(2) Termination of that person's employment; or

(3) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person . . .

As used in the Broadened Garage Coverage, the term "personal injury" is defined as:

"Personal injury" means injury, other than "bodily injury," arising out of one or more of the following offenses:

1. False arrest, detention or imprisonment;

2. Malicious prosecution;

3. Wrongful entry into, or eviction of a person from, a room, dwelling or premises that the person occupies;

4. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

5. Oral or written publication of material that violates a person's right of privacy.

3. PERSONAL INJURY EXTENSION ENDORSEMENT

The Personal Injury Extension Endorsement "extend[s]" the definition of personal injury in the Broadened Garage Coverage "to include mental anguish, mental injury, shock, discrimination or humiliation sustained by a customer."

4. COMMERCIAL GENERAL LIABILITY ("CGL") COVERAGE

The CGL form provides that "[w]e will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage'" The policy further states that,

b. This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage Territory"; and

(2) The "bodily injury" or "property damage" occurs during the policy period.

The exclusion portion provides that "[t]his insurance does not apply to: a. Expected or Intended Injury . . . [or] b. Contractual Liability. . . ."

The definition section defines "Bodily injury" as "injury, sickness or disease sustained by a person, including death re-

sulting from any of these at any time." "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

### 5. COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE

The Commercial Excess Liability Insurance ("CELI") states that Clarendon:

will pay on behalf of the insured the ultimate net loss in excess of the applicable underlying limits which the insured becomes legally obligated to pay as damages because of bodily injury, property damage, personal injury or advertising injury to which this insurance applies. This insurance applies only to:

(1) Bodily injury or property damage:

(a) Occurring during this policy period; and

(b) Caused by an occurrence; and

(2) Personal injury or advertising injury caused by an offense committed during the policy period.

The definition section expanded the definition of bodily injury to include "bodily injury, shock, fright, mental injury, disability, mental anguish, humiliation, sickness or disease sustained by a person, including death resulting from any of these at any time." "Occurrence" remains defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

An "insured" is defined as follows:

1. If you are designated in the Declarations as:

   a. An individual, **you** and **your** spouse are insured, but only with respect to the conduct of a business of which **you** are the sole owner.

   b. A partnership or joint venture, **you** are an insured. **Your** members, **your** partners, and their spouses are also insureds, but only with respect to the conduct of **your** business.

   c. An organization other than a partnership or joint venture, **you** are an insured.

2. Each of the following is also an insured:

   . . .

   c. Any organization **you** newly acquire or form, other than a partnership or joint venture, and over which **you** maintain ownership or majority interest, will be deemed to be a Named Insured. However, coverage does not apply to:

      (1) **Bodily injury** or **property** damage that occurred before you acquired or formed the organization; and

      (2) **Personal injury** or **advertising injury** arising out of an **offense** committed before you acquired or formed the organization.

   . . . .

### 6. EMPLOYMENT PRACTICES LIABILITY

Clarendon's EPL coverage provides:

b. This insurance applies to negligent acts or omissions that are the result of 'employment-related practices' only if:

1. The negligent acts or omissions are caused by an "occurrence" that takes place in the "coverage territory [sic]"; and

2. The negligent acts or omissions did not occur before the Retroactive Date, if any, shown in the Declarations or after the end of the policy period; and

3. A claim for damages because of the negligent acts or omissions is first made against the insured, in accordance with paragraph c. below, during the policy period or any Extended Reporting Period

▮▮▮▮▮▮                           ▮▮▮▮▮▮

we provide under EXTENDED REPORTING PERIODS. . . .

. . .

The exclusion section states that,

This insurance does not apply to:

a. Negligent acts oromissions [sic] when intentionally committed by you or any partner, officer, or director, or at your or their direction.

b. Negligent acts or omissions which are the result of the administration of your employee benefit program.

c. Damages for which the insured is obligated to pay by reason of any obligation or duty required of the insured under any contract or by reason of any liability assumed by the insured under a contract of indemnity.

. . .

Section Five provides the following extended reporting periods:

3. We will provide one or more Extended Reporting Periods, as described below, if:

1. This Coverage Form is cancelled or not renewed;

. . .

3. A Basic Extended Reporting Period is automatically provided without additional charge. This period started with the end of the policy period and lasts for:

a. Five years for claims because of negligent acts or omissions in the "employment-related practices" of the insured arising out of an 'occurrence' reported to us, not later than 60 days after the end of the policy period, in accordance with paragraph 2.a of Conditions (Section IV); or

b. Sixty days for all other claims.

The Basic Extended Reporting Period does not apply to claims that are covered under any subsequent insurance you purchase, or that would be covered but for the exhaustion of the amount of insurance applicable to such claims.

. . .

The definition section defines the following terms:

1. [sic] Employment-related practices" means acts committed by an insured which are directly or indirectly related to the prospective employment, present employment or employment termination of any person by the insured.

. . .

3. "Occurrence" means any negligent act or omission together with all related negligent acts or omissions, including resulting damages claimed by others, which arise out of one or more of the following offenses:

a. discrimination,

b. wrongful termination,

c. harassment,

d. humiliation, or

e. mental anguish; and

which are the result of you [sic] "employment-related practices."